*5 OPINION OF THE COURT
Fuchsberg, J.
 On this appeal, in the face of the trial strategy-adopted by the defendant, we conclude that it was not error to admit testimony concerning the defendant’s submission to a voice stress evaluation test or a tape recording of the test questions and answers. Additionally, we hold that defendant’s oral and written inculpatory statements were not rendered involuntary as a matter of law merely because they followed upon his participation in the test.
After a trial by jury, Joseph Tarsia was convicted of an attempt to murder his estranged wife (Penal Law, §§ 110.00, 125.25, subd 1), and the judgment entered thereon has since been affirmed by the Appellate Division. The operative facts follow.
On December 7, 1975, defendant’s wife, while standing in the doorway of her farmhouse, was struck by what was later determined to be a deer slug fired from a .20 gauge shotgun. Shortly thereafter, when police were already on the scene, defendant emerged from the woods behind the house, where he claimed he had been hunting. He carried a rifle with a spent shell casing still in the chamber; the weapon, however, was incapable of firing the round that injured the wife. Defendant manifested complete surprise when told that his wife had been shot. Except to mention that he had seen two other hunters in the woods, he denied any knowledge of how the shooting had occurred.
Ten days later, defendant was questioned again, this time in connection with what the police described to him as a "possible violation of shooting”. After he had been advised of, and had waived, his Miranda rights, he persisted in denying any involvement in the incident. However, when the detective suggested a means by which he could put to rest any suspicion, especially on the part of the victim’s family, that he was responsible for the shooting, defendant agreed to submit to a voice stress evaluation test, which was arranged for January 28, 1976 at one o’clock.
At the appointed time defendant arrived at the local police department, again was advised of his rights and again waived them, this time in writing. He thereupon was interviewed by one Lieutenant Gaul, who familiarized him with the test procedures and administered the test. Because its results fed *6 the examiner’s suspicions about defendant’s veracity, Gaul questioned Tarsia further about several details of his story. Soon after this, in a cathartic outburst, defendant admitted shooting his wife. He subsequently made one oral and two written confessions during the balance of his session with the police, which lasted until nearly midnight.
Tarsia now contends, as he did unsuccessfully in a pretrial suppression hearing, that the techniques employed by the examiner incidental to the administering of the voice stress test overbore his will to such a degree that his confessions must be deemed involuntary and, thus, inadmissible to prove his guilt. Additionally, he argues that the totality of the circumstances, but chiefly the nearly 11 hours that elapsed between the hour he arrived to take the test and the time his final statement was taken, vitiated the confessions. Finally, defendant alleges as reversible error the introduction of Lieutenant’s Gaul’s testimony describing the administration of the test as well as the subsequent replaying to the jury of the tape-recorded interview, an integral part of the procedure. The Appellate Division rejected all of these contentions (67 AD2d 210). We believe its decision was correct.
Inasmuch as its alleged misuse furnishes much of the basis for defendant’s appeal, some description of the test is in order. Its purpose, like that of the polygraph or "lie detector”, is to measure certain physiological manifestations of stress which commonly are thought to accompany untruthful or evasive answers. While a polygraph records changes in respiration, blood pressure, heart rate and the skin’s resistance to electric current (see People v Leone, 25 NY2d 511, 513; Scientific and Expert Evidence in Criminal Advocacy [Cederbaums and Arnold eds], ch 10, pp 221-222), the theory of the voice stress test is that the utterance of false responses causes involuntary nervous reactions which are manifested by inaudible frequency modulations in the human voice detectable with the aid of a device known as the voice stress evaluator (Moenssens and Inbau, Scientific Evidence in Criminal Cases [2d ed], § 15.13, pp 638-639). The procedure followed in the present case illustrates in greater detail how the instrument is utilized.
The test, which lasted but five minutes, first called upon Gaul, as the tester, to familiarize Tarsia with a prearranged series of questions concerning the shooting in order to avoid *7 his misunderstanding them when he thereafter would be asked to answer each of them with a simple "yes” or "no”. Included were so-called "irrelevant” questions (for example, "Are you presently wearing a hat?”), whose design was to elicit nonstress or "normal” responses for use as standards of comparison. Typical of the relevant queries which focused on the defendant’s role in the episode under investigation were "Do you suspect someone of shooting your wife?” "Do you know who shot your wife?” and "Did you shoot your wife?”; to each, defendant responded in the negative. A tape of the responses, recorded as they were given, was then played through the stress evaluator, which, in turn, produced a chart reflecting the relative degree of stress under which each answer was given, heavy stress presumably indicating an untruthful response.
Unlike the polygraph, whose reliability as a determinant of truth or falsity has been the object of scientific testing during its much longer history, the voice stress evaluator has only come on the market in the last decade, during which it has had not only far less time but also far fewer occasions in which to prove itself. Yet, attempts to demonstrate that the polygraph is possessed of scientific certainty have been held too indecisive to warrant judicial acceptance (People v Leone, supra, p 517; Pereira v Pereira, 35 NY2d 301, 306-307; see, generally, 3A Wigmore, Evidence [Chadbourn rev ed], § 999; Use of Polygraphs as "Lie Detectors” by the Federal Government, H Rep No. 198, 89th Cong, 1st Sess, p 1). Not surprisingly, then, in light of the limited opportunities for judicial appraisal of proofs submitted in support of the accuracy of the voice stress test, with its kindred reliance upon manifestations of a mixture of physical and emotional reactions, that device has fared no better in the courts (see State v Schouest, 351 So 2d 462, 468-469 [La]; Smith v State, 31 Md App 106, 120 ["(a) lie detector test by any other name is still a lie detector test”]). In any event, the People in the present case having failed to challenge these determinations or to make any attempt to prove any advance in the test’s acceptance in the scientific community, we confine ourselves to observing that, unlike the degree of equivocation that exists regarding the reliabiity of the polygraph (see People v Leone, supra, pp 514-516), authorities on voice stress analysis tend to agree that test is not reliable (see Moenssens and Inbau, Scientific Evidence in Criminal Cases [2d ed], § 15.14; Link, Detection *8 Through Voice-Analysis, 3 Military Police Law Enforcement J, pp 38, 40).
This said, we now consider the contention that the trial court should not have allowed Lieutenant Gaul to describe his administering of the voice stress test. In this connection, it should be made clear that the lieutenant did no more than present a word picture of his preliminary interview with the defendant, as well as recite the questions he had put, the answers he had received and the substance of the ensuing interview in which he had engaged the defendant. For practical purposes, he did not communicate the evaluator’s recording nor his own interpretation of the data it produced. And, other than that these may have been included in his part of the colloquy that surrounded the giving of the test, he did not characterize defendant’s answers as true or false.
We specifically note too that the propriety of this testimony and of the tape-playing episode must both be evaluated in the perspective of the trial strategy mounted by defendant’s counsel. Apparently convinced that a successful defense hung on the possibility of overcoming the seemingly insuperable handicap created by the three sets of admissions, he elected early on to candidly concede the making of the confessions. Obviously, he hoped to shift the decisive focus of the trial onto his contention that the criminal charges, and the confessions on which they so heavily depended, were produced by psychological pressures which drew their strength from a highly suspect and invidious pseudo-scientific device. To that end, the role of the test as the lynchpin of the defense of involuntariness was to be stressed throughout the trial in an attempt to correlate it with the graduation of the confession from one which started, in the first statement, with Tarsia’s specific denial of intent to kill and, as the argument went, culminated, under pressure of the police activity, in one in which he was willing to say that he intended to kill.
So, when the District Attorney in his opening briefly alluded to the defendant’s voluntary submission to the stress test, defense counsel not only made no objection but, indeed, by his own remarks to the jury, made it his business to expose, rather than to suppress, the circumstances surrounding the testing of his client. Holding to this course, he also interposed no objection to Lieutenant Gaul’s testimony, not even when the witness, without defining the significance of his comment, at one point stated that he "saw stress indicated on the chart *9 in regard to [Tarsia] shooting his wife”. It requires only elementary insight to understand that these tactics facilitated counsel’s own extensive cross-examination of the lieutenant along lines that would enhance the coercion theory on which he relied. Aside from problems of nonpreservation, for the defendant, aided by the advantages of hindsight, to now be permitted to reverse his chosen course and claim that the testimony regarding his submission to the stress test should have been excluded, would be to countenance his eating his cake and having it too. This we will not do. (Cf. People v Piazza, 48 NY2d 151, 163.)
This brings us to the tape-playing. It was almost at the conclusion of the lieutenant’s direct testimony that the prosecutor sought to play the tape which had recorded the stress interrogation and defendant’s subsequent admissions. Beside use of the occasion to renew his contention that the admissions were coerced, the sole objection defendant registered was directed only to the admissibility of the "test results”. In an accompanying colloquy, the District Attorney willingly conceded that any evaluation of defendant’s veracity could not go before the jury and pointed out that the playing of the tape could not serve such a purpose. It was equally clear that his offer was not intended to embrace any such proof, but instead would constitute demonstrative evidence which might shed some light on the tone, pace, timing and other audible characteristics of the questions and answers, with the precise words of which jury already had been favored. It cannot be gainsaid that defendant could have urged that, in the wake of the earlier description of the general purpose of the test’s questions and answers, the jury had been so hypersensitized to the nuances of speech of both interrogator and subject that it might, for instance, unwarrantedly and prejudicially read the defendant’s slightest pause and inflection as a sign of his mendacity. And true, in some circumstances a test that may carry with it an aura of scientific certainty could block out full consideration of other facets of proof so that the ability to obtain a fair decision could be compromised. On the other hand, from its point of view, the prosecution could have responded that the defendant’s concentration on the allegedly coercive nature and effect of the testing procedure had opened the door. However, we need not reach such a question in this case for, defendant having failed to specify this ground for his objection, the issue has not been preserved for our considera *10 tion (see CPL 470.05, subd 2; People v Moore, 42 NY2d 421, 435).
With all this as background, we may now examine the merits of defendant’s claim that the use of the voice stress test somehow coerced his confessions. We begin with the reminder that much of what is cherished in our society may be traced to the Federal and State Constitutions’ steadfast refusal to countenance confessions obtained by coercive means. To declare otherwise, in effect that the end of securing the conviction of a criminal justifies whatever means, however inhumane, the State chooses to employ, would signal the demise of public trust in the institutions of Government (see Olmstead v United States, 277 US 438, 485 [Brandeis, J., dissenting]). So, the law brooks no infringement of due process rights at the time they are most needed, when the accusatorial power of the State is brought to bear in the course of a criminal investigation. Everyone therefore agrees that "third degree” methods are intolerable; their potential for generating unreliable, if not patently false, confessions is readily recognizable even by the most unsophisticated (see, Paulsen, Fourteenth Amendment and the Third Degree, 6 Stan L Rev 411, 429; White, Police Trickery in Inducing Confessions, 127 U of Pa L Rev 581, 585).
However, while more subtle methods, though sometimes harder to perceive, are equally to be condemned when they trammel on the rights of those in custody (see Driver, Confessions and the Social Psychology of Coercion, 82 Harv L Rev 42, 51; Sobel, New Confession Standards, p 8), it may take a discerning eye to tell those that are fundamentally unfair from those which are no more than permissible instances in which the police have played the role of "midwife to a declaration naturally born of remorse, or relief, or desperation, or calculation” (Culombe v Connecticut, 367 US 568, 576 [Frankfurter, J.]). What emerges from the cases is a reliance on the spirit of the constitutional protections, tampered always by the particular circumstances of each case (see People v Anderson, 42 NY2d 35, 38; Stein v New York, 346 US 156, 185; ALI Model Code of Pre-Arraignment Procedure, §§ 140.2, 140.4, 140.6, 150.2).
In.this case, the coerciveness argument derives from the subsidiary claims that defendant was misinformed as to the purpose of the voice stress test and made to believe that the test could prove his story false, as a result of which he felt *11 under a compulsion to confess. Although there is no per se rule which makes confessions that follow on the heels of such a test inadmissible (see People v McGuffin, 55 AD2d 772, 773; United States v McDevitt, 328 F2d 282, 284 [involving polygraphs]), it would be naive to assume that the potential for abuse does not exist (see Bruner v People, 113 Col 194), or that, in appropriate circumstances, the use of voice stress test, like a polygraph, might not be a factor contributing to an involuntary confession (see People v Leonard, 59 AD2d 1, 14-15; People v Zimmer, 68 Misc 2d 1067, affd 40 AD2d 955; Ann., 23 ALR2d 1306).
For example, in People v Leonard (supra), a polygraph was found to have been misused to extract a confession. There, the examiner, professing to be concerned with helping the defendant, conveyed to him the impression that the machine was infallible and knew the truth (p 15) "just like [you] and God”, and detectives assured him that the machine had proved he had "lied” and that the examiner would so testify. Similarly, in People v Zimmer (supra), the confession was found to have been coerced when the defendant was repeatedly told by the examiner that the test revealed her untruthfulness and that its results could be used against her.
Our case evidences none of the characteristics that made the police tactics in Leonard and Zimmer so egregious. Admittedly, there was at least some measure of guile employed by the police, notably in imparting to the defendant that their concern was "a possible violation of shooting” rather than the serious charge of attempted murder. But such stratagems need not result in involuntariness without some showing that the deception was so fundamentally unfair as to deny due process (see People v Leyra, 302 NY 353; People v Isaacson, 44 NY2d 511, 520-523; cf. Brewer v Williams, 430 US 387) or that a promise or threat was made that could induce a false confession (People v Pereira, 26 NY2d 265, 266-267; People v McQueen, 18 NY2d 337, 346; United States ex rel. Everett v Murphy, 329 F2d 68, 70).
Here, no impression that the voice stress test was omniscient was foisted upon defendant. To the contrary, he was informed that the test could not determine whether he was lying. In addition, Lieutenant Gaul explained in advance what the signs of stress would be and examined the stress chart in defendant’s presence. Moreover, there was no misrepresentation made that the test results could be admissible in a trial *12 against him. Rather, the test was used simply as an investigatory tool.
Nor can it be said as a matter of law that the police, their investigatory ardor not having been stilled by the test results, continued their inquiry in a manner calculated to undermine defendant’s free will. The record shows that they did not browbeat Tarsia with accusations of untruthfulness. True, Lieutenant Gaul did provocatively remark, upon examining the stress chart: "it looks like you have a serious problem here; it doesn’t look good from this particular test * * * it makes me have my doubts.” And he did confront the Miranda-warned defendant with several details from his version of the events of December 7 that Gaul asserted raised doubt as to Tarsia’s veracity: that the presence of a spent shell in defendant’s rifle was unusual because a hunter normally would automatically eject a shell after firing and reload the weapon; that, although defendant claimed to have shot at a deer, he never went to check for signs of whether he hit the deer; and that defendant had stated that he had gone to Binghamton for lunch that day — a 40-mile round trip. But this does not tell us that the confession that quickly followed was any more than the product of the permissible intimation that it was useless for Tarsia to conceal his culpability any longer.
Furthermore, it is uncontested that defendant voluntarily consented to participate in the test, appeared at the police station of his own volition and, though informed orally and in writing beforehand that he need not submit to the test and, if he chose to, could have counsel with him, never so much as hesitated in his co-operation with the police (see People v Wilson, 78 Misc 2d 468, 479, affd 47 AD2d 671).
Finally, as to the far from inconsequential fact that the defendant spent 11 hours, most of it in custody, with the police on the day he confessed, there is no claim he was ever physically abused or mistreated; or not allowed an opportunity to speak with the only person he requested to see, the woman with whom he was cohabiting; or even denied refreshment; or that there exist any circumstances not already detailed in this opinion on which any assertion of involuntariness can be posited (compare People v Anderson, 42 NY2d 35, 39-41). Additionally, that he was advised of his Miranda rights periodically during this interval, each time agreeing to waive them, is unquestioned. Without more, the length of time involved did not render the confessions obtained during that *13 period inadmissible (see People v Carbonaro, 21 NY2d 271, 277; People v De Jesus, 63 AD2d 148, 153-154).
Consequently, on the total evidence, we are compelled to reject the contention that the proof was insufficient as a matter of law to support the affirmed findings that defendant’s inculpatory statements, notwithstanding, in particular, the use of the voice stress test, were voluntary and not the product of coercion (see People v Stephen J. B., 23 NY2d 611, 616; People v Leonti, 18 NY2d 384).
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Meyer concur.
Order affirmed.