*712 OPINION OF THE COURT
Paño Z. Patsalos, J.
Defendant was charged in a one-count indictment with the crime of criminal possession of a controlled substance in the first degree. In her omnibus motion, among other forms of relief, defendant seeks to suppress any and all physical evidence obtained by the State Police.
A hearing was held at which three Troopers and one investigator, all with the State Police, testified, as did the defendant. The court, insofar as relevant to these proceedings, makes the findings of fact hereinafter set forth.
It appears that on September 30, 1993 at approximately 12:30 a.m. the defendant was a passenger in a vehicle being operated by a Mr. Highsmith. There were no other occupants in the vehicle. As the vehicle proceeded through the toll booth plaza in the Town of Woodbury in Orange County, New York, it was observed by Troopers who were parked in their patrol vehicle some distance west of the toll plaza. The Troopers testified that they observed this vehicle’s right headlamp not to be functioning. As this vehicle proceeded in a westerly direction, the Troopers brought it to a stop on the shoulder of New York State Route 17. Both Troopers exited their vehicle and approached the stopped vehicle. Upon inquiry of both the driver and passenger it was determined that neither was in possession of an operator’s license, nor was any paperwork regarding the registration of the vehicle produced. However, the operator did provide an expired temporary insurance card. Upon further inquiry of both the operator and passenger, neither had any form of identification to present to the Troopers.
The Troopers observed the rear driver’s side window to have been smashed, with glass all over the back seat and floor, damage to the right front quarterpanel and what appeared to be a bullet hole in the door of the driver’s side of the vehicle. Upon making such observations the Troopers returned to their vehicle, radioed to their station to check the ownership of the vehicle, whether it was reported stolen, if the driver had a valid operator’s license and to check on the passenger. Both Troopers then exited from their vehicle and requested the driver to step to the rear of his vehicle, while the passenger remained inside.
One of the Troopers requested backup assistance. At some point before the backup Troopers arrived, one of the Troopers *713 first on the scene was told that the rear window was smashed as the vehicle had been vandalized in New York City. Assistance did arrive in the person of Trooper Kreppein, together with a partner, and a canine. The testimony of the Troopers and the defendant as it relates to the foregoing events appears to be in general agreement.
Upon his arrival Trooper Kreppein was briefed by one of the other Troopers relative to the information obtained from the occupants, as well as the observations made of the vehicle. The testimony of what transpired thereafter at the scene of the highway stop is not in total agreement. Notwithstanding the disagreements, it appears that Trooper Kreppein did speak with the defendant and re-asked some of the questions regarding where the defendant and driver were coming from, where they were going, where they had been, their names and dates of birth. As all Troopers were outside of their vehicles, there is no indication that the station had transmitted any information regarding the vehicle, the driver or the passenger. It further appears that Trooper Kreppein, in substance, stated to one of the other Troopers that everyone should proceed to the barracks where they could better sort out and confirm the situation regarding the vehicle and the occupants. Trooper Kreppein testified he spoke with defendant while she was standing near the front passenger side of the first Trooper car and also in front of the stopped vehicle. There is conflicting testimony as to the position of the three vehicles on the highway. Some testimony places the vehicles in a straight line, one directly behind the other. Other testimony places the vehicles one behind the other, but in staggered formation.
At some point Trooper Kreppein stated to defendant that the driver of the stopped vehicle said it was okay to search the car with his dog, and it would be a canine narcotics search. The Trooper testified the defendant became visibly nervous when she was so informed. Trooper Kreppein stated to the defendant that if they all proceeded to the State Police barracks she would have to ride in the back of his vehicle, which vehicle contained his canine. Defendant states she became nervous and "scared” when so advised. The Trooper further informed the defendant that the canine was drug-trained and if she were carrying anything illegal, the dog would respond aggressively and the dog would bark if there were drugs on her person. The Trooper further stated that while he was speaking with the defendant he heard the dog barking. Notwithstanding the canine vehicle was some distance behind *714 where defendant was standing, she claimed she was able to see and hear the dog. Trooper Kreppein testified that upon his making the statement regarding the conduct of the dog that the defendant stated "What if I have something,” to which he responded, how much do you have, and the defendant replied, "A lot.” Although the defendant denies any such conversation, both the Trooper and the defendant agree it was at or about this point that defendant reached under her sweater or shirt and removed from one side of her bra a plastic bag containing 301.31 grams of a white chunky substance and from the other side, a plastic bag containing 218.30 grams of the same substance. The defendant was then placed under arrest, handcuffed, taken to Trooper Kreppein’s canine vehicle and seated in the back of that vehicle. To the rear of where she was seated was the canine secured in a kennel.
Defendant testified that before she removed the plastic bags from under her shirt, Trooper Kreppein walked her back to the canine vehicle. She stated that the dog was barking, moving around freely in the cab of the vehicle and that Trooper Kreppein said the dog was vicious. Defendant stated she was able to identify the dog as a rottweiler, as her neighbor owned a dog of the same breed. She further testified that Trooper Kreppein said if she had anything on her that the dog would smell it. The defendant stated it was after these events that she removed the plastic bags from her person.
Trooper Kreppein testified that when he stated to defendant the dog would be able to detect illegal drugs on her person, he did not have any basis to suspect she had any drugs, and such statement was made as a "ruse” or a "ploy.” He went on to testify that the dog was not trained to detect drugs on a person but was trained to search for drugs in a vehicle or other nonhuman objects.
Further recitation of the facts is not necessary for the court to make its conclusions of law and arrive at its decision.
Based on the preceding findings of fact the court makes the following conclusions of law:
The uncontroverted testimony in the course of the hearing compells the determination that the car in which defendant Affie T. Lee was a passenger was properly stopped for a vehicle and traffic violation, to wit, a malfunctioning headlight. (People v Ingle, 36 NY2d 413.) The New York State Police properly made inquiry of the driver of the automobile regarding license, registration and identification. (See, Vehicle *715 and Traffic Law § 401 [4]; People v Ellis, 62 NY2d 393.) The court is satisfied from the facts adduced that upon the driver’s failure to produce proper credentials, the police had a justifiable right of inquiry of the defendant as to her identification, which involved "basic, nonthreatening questions regarding, for instance, identity, address or destination.” (People v Hollman, 79 NY2d 181, 185.)
Since neither occupant produced nor was in possession of an operator’s license, the registration or any identification, and as the vehicle was damaged as described at the hearing, it was not unreasonable that the Troopers justifiably suspected the vehicle in question may have been used without permission of its rightful owner and properly proceeded with their inquiry in that vein. The Troopers then used their car radio to request their station to run a check on the vehicle, as well as the occupants. Under the circumstances, it would have been reasonable if, at this point, the Troopers elected to transport the defendant and driver to their barracks station to clarify the status of the vehicle and the occupants. (See, People v Foster, 173 AD2d 841.)
It is clear from the testimony that the Troopers had no justifiable suspicion that contraband was involved in their investigation or that the defendant personally possessed any contraband. At best, the investigation concerned the possibility that the vehicle may have been stolen. However, the nature of the inquiry, notwithstanding its being labeled by Trooper Kreppein as a "ruse” or "ploy,” intensified with the appearance of Trooper Kreppein and his canine on the scene.
The law in this State is clear that a vehicle stop, even if justified by a traffic violation, may not be used as a pretext to investigate on an unrelated matter. (People v Woods, 189 AD2d 838.) It is further clear that "[t]he common-law power to inquire does not include the right to unlawfully seize. The minimum requirement for a lawful detentive stop is a founded suspicion that criminal activity is afoot.” (People v Cantor, 36 NY2d 106, 114.)
Throughout the conversations between Trooper Kreppein and the defendant, the attention of the parties was significantly drawn to the dog by its barking. However, there is no clear testimony that the dog was caged or that its kennel was visible from the locations where Trooper Kreppein and the defendant conversed. Thus, when Trooper Kreppein stated to the defendant that the driver gave permission for the dog to *716 make a narcotics search of the vehicle and he explained to the defendant that the animal was trained to act aggressively in the presence of contraband and advised the defendant that she would be required to ride in the back seat of the police vehicle accompanied by the dog, anyone innocent of a crime would believe that they were not free to leave and were, in fact, in custody. (People v Yukl, 25 NY2d 585.) The property, therefore, was not turned over to the police consensually, but rather in submission to authority.
It therefore becomes clear that the Trooper’s questioning of the defendant was performed in a custodial setting in which both she and the Trooper believed she was not free to leave and would be compelled to sit in the back seat of a vehicle in the company of a rottweiler, who was trained to aggressively search out the presence of drugs on a person. Trooper Kreppein’s inquiry of the defendant escalated to the point permissible only if the Trooper has "a founded suspicion that criminal activity is afoot.” (People v Cantor, supra, at 114.) This he admittedly did not have, as he stated it was a "ruse” or "ploy” unsupported by any activity or conduct of defendant.
The voluntariness of a consent depends on whether the consent was the product of free and unconstrained choice. (Schneckloth v Bustamante, 412 US 218.) For the defendant’s consent to be voluntary under the totality of circumstances (People v Gonzalez, 39 NY2d 122), the People bear the burden of proof. (People v Kuhn, 33 NY2d 203.) The use of deception doesn’t destroy the voluntariness of consent, per se, unless the deception is so fundamentally unfair as to deny due process. (People v Tarsia, 50 NY2d 1.) However, false representation of facts that normally establish the exercise of police authority, to which a person would ordinarily yield, may amount to a deception that undermines the validity of consent. (People v Abrams, 95 AD2d 155.) Misrepresentation by police that they were from the gas company investigating a gas leak was found to be a submission to authority rather than voluntary consent to enter (People v Jefferson, 43 AD2d 112), and police advice that a person’s vehicle had been involved in an accident did not allow voluntary consent to access to that person’s premises. (People v Torres, 45 AD2d 185.) Classically, the false representation of a police officer that he possesses a search warrant when he does not, results in a nonconsensual submission to police authority. (Bumper v North Carolina, 391 US 543.)
There is a significant meaningful distinction between a ruse *717 and a threat which presupposes physical harm or danger. A person innocent of any illegal activity would react to the improper police conduct here exhibited. A proper "ruse” or "ploy” must be subtle enough to cause a different result, response or reaction from a guilty conscience than from the pure of heart. (See, People v Everett, 10 NY2d 500; People v Burnett, 99 AD2d 786; People v Hassell, 180 AD2d 819.)
It is, therefore, this court’s conclusion that Ms. Lee submitted to authority and was compelled by intimidation to produce from within her undergarments the property with which she is here accused of illegally possessing. Since this property was wrongfully acquired and improperly seized, it cannot be used against her and, therefore, such physical evidence is suppressed. As the admissions before this court were obtained as a direct result of the illegal seizure, they must fall as fruit of the poisoned tree. (Wong Sun v United States, 371 US 471; People v Rodriguez, 11 NY2d 279.)
Parenthetically, in the course of the hearing above referred to, this court was made , aware of the existence of a court-ordered "bug” in the vehicle in which the defendant was a passenger. This court also was made aware that conversations may or may not have been recorded both prior and subsequent to the arrest for the crime charged, presently before this court. It is this court’s feeling that since there is an order that appears proper on its face allowing the installation of a recording device in the vehicle in question, and the court is satisfied there were independent grounds justifying the initial stop of the vehicle, the question of the knowledge chargeable to the State Police independent of that probable cause based on the vehicle and traffic violation need not be resolved in this forum.