OPINION OF THE COURT
Victor M. Ort, J.
Pursuant to a stipulation in lieu of motions, a hearing was *1020 held on defendant’s motion to suppress statements. The hearing was held on September 23, 24, and 25, 1998. Donald Miller and Detective William Kinsley testified for the People. At the commencement of the hearing, defendant also moved for reinspection of the Grand Jury minutes and dismissal of the indictment on various grounds. For the reasons which follow, defendant’s motion to suppress statements is denied. The motion to reinspect the Grand Jury minutes is granted, but upon reinspection the motion to dismiss the indictment is denied.
Findings of Fact
Donald Miller, who is an experienced police informant, met the defendant Kenneth Fox towards the end of December 1997 when they were both incarcerated at the Nassau County jail. At the time that they met, Mr. Miller was charged with the felony of scheme to defraud in the first degree and misdemeanor criminal contempt charges. The two men became friends in the correctional institution, and in March of 1998 Mr. Fox confided to Mr. Miller that he had secreted monies from his mother’s estate. Mr. Fox told Miller, in substance, that he had been held in contempt by the Surrogate for withholding estate monies for which he had not made a proper accounting to the court. Mr. Fox also indicated that he was represented by counsel in connection with the civil contempt proceeding.[1] Mr. Fox stated that he considered his brother Dean and his brother Roger to be partially responsible for his incarceration, that he hated both of his brothers, and that he wanted to have one of his brothers killed. Mr. Fox also expressed a desire to harm the Surrogate. Finally, Mr. Fox spoke of a woman to whom he had entrusted $45,000 who had squandered the money. Mr. Fox was concerned about this woman because she was in possession of certain documents of his which would prove damaging if they were obtained by the IRS. Mr. Miller told Fox that he knew someone who could “take care” of his brother for him.
On March 18, 1998 Miller wrote a letter to Surrogate Radigan, informing him of Mr. Fox’s intentions and offering to be of assistance to law enforcement. Surrogate Radigan forwarded the letter to the Nassau County District Attorney’s office. In response to Mr. Miller’s letter, Assistant District Attorney (ADA) Stephani Meister and investigator Ray Heffernan of the Nassau County District Attorney’s office arranged to meet with *1021 Mr. Miller on March 24. At the meeting Ms. Meister questioned Miller about the matters mentioned in his letter to Surrogate Radigan, took notes, and told him she would get back to him shortly as to whether he would be accepted for cooperation with the District Attorney’s office.
On March 26, 1998, Mr. Miller returned to the District Attorney’s office. At that time Mr. Miller was represented by counsel, David Teeter, Esq., of the Legal Aid Society. Counsel and Mr. Miller met with ADA Ralph Posteraro who offered Mr. Miller the opportunity to cooperate in an investigation of Mr. Fox. Mr. Posteraro issued a “cooperation letter” to Mr. Miller’s counsel wherein he stated that “the full extent and results” of Mr. Miller’s cooperation would be brought to the attention of the Judge and prosecutors involved in Mr. Miller’s pending case. No commitment as to sentence or other disposition of the case was made at that time.[2] Mr. Miller was then debriefed by Mr. Posteraro, Detective Kinsley and his partner, Detective Jack Kennedy. During the debriefing, Mr. Miller mentioned that Mr. Fox had previously been represented by counsel in connection with the civil contempt charges. However, it is unclear whether the detectives were actually aware that Mr. Fox was represented by Mr. Clifford at that time.
Mr. Miller was provided by the detectives with a telephone number and instructed to tell Mr. Fox that he could contact a “hit man” through that telephone number. The telephone number was actually for a phone being operated by the District Attorney squad, and was to be answered by Detective Kinsley. Mr. Fox was to be told to call the number on Tuesday, March 31, between 6:00 and 8:00 p.m. and ask for “Billy”. Upon his return to the jail, Mr. Miller conveyed this information to Mr. Fox, portraying Billy as an individual connected to organized crime.
The next day, March 27, Mr. Miller and Mr. Fox had a further conversation in which Mr. Fox indicated that the best time to kill his brother Roger would be when he appeared for an upcoming hearing in the Surrogate’s Court. Mr. Fox stated that he expected that both Roger and his wife would be coming in from Vermont for the hearing.
On March 28, Mr. Miller was again approached by Mr. Fox who at this time seemed very upset. Mr. Fox stated that he *1022 had arranged to post bail in the amount of $5,000 for James Ayres, another inmate at the Nassau County jail. Mr. Fox indicated that in exchange for his posting bail for James Ayres, that Ayres was to “do something” to Mr. Fox’s brother. However, after being released on bail, Ayres failed to perform his part of the bargain and Fox heard that Ayres was “bragging about it.” Mr. Fox indicated that he was interested in having Billy “smack Jimmy around” in order to get the $5,000 back and stop Ayres from disclosing their prior arrangement. Mr. Fox also inquired of Mr. Miller whether he thought Billy would be able to obtain some checks for him and also set up a “three-way”, or conference, telephone call. Mr. Fox stated his opinion that he would be less likely to be implicated if Billy were to give his brother a severe beating and “make it look like a robbery.” In response to a question from Mr. Fox, Mr. Miller indicated that he believed Billy would charge approximately $20,000 to perform this service.
Mr. Miller and Mr. Fox spoke again on March 29 at which time Mr. Fox stated that he had hidden estate money in St. Marten. Mr. Fox indicated that although there was no treaty with the Netherlands providing any procedure for the recovery of the funds, Judge Radigan had written to the government in that country requesting that the money be returned. Mr. Fox indicated that he would “get even” with the Surrogate for taking this action. Mr. Fox also stated that he wanted Billy to visit him at the jail in order to discuss his plan.
Thereafter, Mr. Fox made a series of telephone calls to “Billy” at the telephone number on March 31, April 3, April 7, and April 9, 1998. All of the telephone conversations were tape-recorded by Detective Kinsley. Mr. Miller was in close proximity to Mr. Fox while the telephone calls were being made.
In the telephone conversation of March 31, Mr. Fox spoke with Billy about giving someone a “mild beating.” Although Roger Fox was mentioned, there was no firm agreement to make him the target at that time. Mr. Fox indicated that payment would be arranged through his lawyer in Manhattan.
On April 3, Mr. Fox again spoke with Billy. In this conversation, Mr. Fox alluded to having arranged bail for Jimmy Ayres in exchange for Ayres agreeing to burglarize Roger’s home in Vermont. Mr. Fox discussed having Billy recover the $5,000 bail money as well as a map which had been drawn of the Vermont premises. Fox also suggested that Billy could keep half the $5,000 as his fee for dealing with Ayres, and that the other half would be an advance on the job which had previously been discussed.
*1023 On April 7, Mr. Fox again telephoned Billy. In this conversation, Mr. Fox made clear that the intended victim was his brother Roger. At first Mr. Fox stated that he wanted Roger “taken care of* * * plenty severely.” However, he subsequently indicated that he wanted his brother shot and killed.
Between April 7 and April 9, 1998, Mr. Fox and Mr. Miller again spoke in the jail. During that time Mr. Fox stated that he had hired Billy to kill his brother. Mr. Fox also voiced his concern that the plan would be detected because the telephones at the jail were being tapped. Mr. Fox indicated that the person who had alerted him to the possibility of his calls being intercepted was Dennis Lemke, an attorney who had represented him on an unrelated criminal case approximately a year before. Mr. Fox stated that he was going to “brush Billy off’ by claiming that he did not have the money to pay him for the contract.
On April 9, Mr. Fox again called Billy from the Nassau County jail. In this call Mr. Fox indicated that he wanted to “stop everything” because he had received word from “the Caribbean” that the estate assets which he had been secreting had recently been seized. On April 15, Mr. Miller was brought to the detectives’ office to be questioned as to his understanding as to why Mr. Fox had canceled the contract.
On June 3, Mr. Fox again met with Mr. Miller and stated that he wanted to “rearrange” the hit and to have Miller contact Billy and act as “the middleman.” Mr. Fox also indicated that he had a $2,000 check which was available as a down payment on the contract. An indictment was filed against Mr. Fox on June 11, 1998.
Conclusions of Law
A. Motion to Dismiss the Indictment
Defendant contends that the Grand Jury proceeding was defective because the testimony of Donald Miller, a government informant, was elicited largely through leading questions. Whether a witness may be examined by leading questions in the Grand Jury is within the discretion of the District Attorney as the law advisor to the Grand Jury. (See, e.g., People v Brownlee, 121 AD2d 553 [2d Dept 1986].) Since Mr. Miller was an informant, he was neither hostile to the prosecution nor reluctant to testify. However that may be, testimony concerning preliminary matters may be elicited through leading questions in order to expedite the proceedings. To the *1024 extent that Mr. Miller’s testimony in the Grand Jury was of a preliminary nature to show how Mr. Fox was introduced to Detective Kinsley, it was not an abuse of discretion for the prosecutor to use leading questions to elicit this testimony.
Defendant also contends that the prosecutor engaged in leading questions concerning the subject of the purported renunciation of the contract to kill defendant’s brother. The Grand Jury minutes make clear that when this subject was first introduced, the prosecutor expected a negative response to the question, “Was it your understanding that he had permanently decided to cancel plans to kill his brother Roger?” (Minutes, at 14.) That the witness surprised the prosecutor by answering “yes” to this question belies any claim that defendant was prejudiced because the question suggested a particular answer. Subsequent questioning merely clarified the witness’ position on the issue and was not of a leading nature.
The court also notes with respect to the prosecutor’s manner of examining Mr. Miller that criminal charges had been pending against the witness. Despite the fact that Mr. Miller had recently entered a guilty plea, there remained the possibility that the plea could be withdrawn. Thus, the prosecutor was entitled to utilize leading questions to control the witness’ testimony and avoid the danger of conferring immunity. (See, CPL 190.40.)
Defendant next argues that the Grand Jury proceeding was defective because the prosecutor failed to present evidence of Mr. Miller’s prior convictions to the Grand Jury. The prosecutor owes a duty of fair dealing to the accused in the Grand Jury. (People v Lancaster, 69 NY2d 20, 26 [1986].) However, a Grand Jury proceeding is not an adversary proceeding, and the People are not obligated to present all evidence in their possession which is favorable to the accused. (Supra.) Thus, the prosecutor is not obligated to impeach a witness with prior criminal convictions when the prosecutor believes that the witness’ testimony is truthful. Nor was it necessary to show the precise terms of Mr. Miller’s cooperation agreement or specifically charge the Grand Jury that Mr. Miller expected to receive a benefit from his testimony. In any event, the court notes that the Grand Jury was advised as to the nature of Mr. Miller’s pending charges, as well as the fact that he was currently incarcerated.
With respect to the defendant, evidence was presented to the Grand Jury that Mr. Fox had been found to be in civil contempt by the Nassau County Surrogate’s Court and was currently *1025 incarcerated. The court has determined that appropriate limiting instructions were given to the grand jurors. The instructions were to the effect that they could consider this evidence only as bearing on defendant’s motive for soliciting the undercover to assault or kill defendant’s brother and opportunity to contact the undercover from the Nassau County jail. The grand jurors were instructed not to consider this evidence as showing a propensity or disposition to commit the crimes charged.
Finally, contrary to defendant’s contention, the grand jurors had reasonable cause to believe that Mr. Fox had not renounced the plan to kill his brother. As stated in the court’s prior decision, the tape-recorded conversations make clear that Mr. Fox’s fear of detection was, at least in part, his motive to call off the criminal venture. Accordingly, that branch of defendant’s motion which seeks to dismiss the indictment is denied. ,
B. Motion to Preclude Statements
During the course of the hearing, defendant moved to preclude certain statements made to Mr. Miller on the ground that the statements varied from the “sum and substance” of the statements as to which notice had been given pursuant to CPL 710.30. The issue of whether the challenged statements were actually made is beyond the scope of this hearing and must await resolution until the trial of the action. (People v Washington, 51 NY2d 214, 221 [1980].) CPL 710.30 (1) provides that “[w]henever the people intend to offer at a trial * * * evidence of a statement made by a defendant to a ‘public servant’, which statement if involuntarily made would render the evidence thereof suppressible * * * they must serve upon the defendant a notice of such intention, specifying the evidence intended to be offered.” Defendant argues that since a confidential informant is a State agent, he should be considered a “public servant” for purposes of the CPL 710.30 notice requirement.
The court notes at the outset that it is unclear whether the People are required to give notice pursuant to CPL 710.30 as to statements made to confidential informants. While it appears that CPL 710.30 notice must be served in the Second Department (see, People v Boswell, 193 AD2d 690 [2d Dept 1993]), the First Department has held that confidential informants are not public servants, so that notice is not required. (See, People v Stern, 226 AD2d 238 [1st Dept 1996].) While the question of whether informants are “public servants” is intriguing, the court need not answer it to resolve the current motion.
*1026 Mr. Fox has moved to preclude a statement which he made to Mr. Miller on March 28, 1998 concerning Jimmy Ay-res’ having to “do something” against Mr. Fox’s brother in exchange for the posting of his bail. Item 9 of the People’s statement notice refers to “what Jimmy was supposed to do” for the $5,000. The statement sought to be precluded does not expand significantly upon that item. Moreover, the law is well settled that res gestae statements, i.e., declarations accompanying and elucidating the criminal transaction, are not subject to the notice requirement. (People v Wells, 133 AD2d 385 [2d Dept 1987].) Since this statement was made to Mr. Miller just three days prior to the initial phone call from Mr. Fox to Detective Kinsley, it is clearly part of the narrative leading up to Fox’s soliciting the detective to harm or kill Fox’s brother Roger. Additionally, the statement elucidates the payment arrangement whereby Billy was to hold the money collected from Ayres as a down payment on the contract involving defendant’s brother. Nor do the other details of the March 28 conversation depart significantly from the statement notice. In these circumstances, the court concludes that, while the People’s notice was not perfect, it was sufficient as to the statements made to Miller on March 28.
Defendant next moves to preclude the statement he made between April 7 and April 9 when he admitted to Mr. Miller in the jail that he had hired Billy to kill defendant’s brother Roger. Defendant correctly notes that no notice was given as to this statement. However, since Mr. Fox and Billy had agreed in their tape-recorded conversation of April 7, that they would speak again on April 9, the solicitation of Billy was ongoing. That being so, Mr. Fox’s statement to Miller, which could have occurred as late as April 9, must be held to be sufficiently contemporaneous to be considered as accompanying the solicitation. Furthermore, in his tape-recorded conversation with Detective Kinsley on April 7, Mr. Fox appeared somewhat indecisive as to whether he wanted his brother killed or merely beaten “plenty severely.” Given the ambiguity of Fox’s purpose, the statement to his confidante, Miller, who had been instrumental in introducing him to Billy, elucidates defendant’s actual intention. Thus, Mr. Fox’s statement to Miller was part of the res gestae, and no separate notice was necessary.
C. Motion to Suppress Statements
Defendant moves to suppress all of the statements which he made to Mr. Miller and Detective Kinsley on the theory that *1027 Miller was acting as an agent of the police, and that all of the statements to Mr. Miller and Detective Kinsley were taken in violation of defendant’s right to counsel because counsel had been assigned in the civil contempt proceeding. The People concede that Miller became a State agent upon the issuance of a formal cooperation letter on March 26, 1998. However, defendant, based upon the fact that Miller had previously provided information to the Federal Government, argues that Miller was a State agent from the beginning of his encounter with Mr. Fox. Clearly, the fact that an informant has previously provided information on other defendants and received a benefit for his cooperation is relevant to the question of whether an agency relationship has been established. (See, People v Cardona, 41 NY2d 333, 335 [1977].) However, since there is absolutely no evidence that the police or District Attorney’s office were aware of Mr. Miller’s conversations with Mr. Fox until after they received the letter from Judge Radigan, no agency relationship could have arisen before that time.
At the initial meeting with representatives of the District Attorney’s office on March 24, 1998, Ms. Meister took notes on Mr. Miller’s information and told him he would hear shortly as to whether he would be accepted as an informant. No instructions were given to Mr. Miller at that time. Where an informer works independently of the prosecution, provides information on his own initiative, and the government’s role is limited to the passive receipt of information, the informer is not, as a matter of law, an agent of the government. (People v Cardona, supra, 41 NY2d, at 335.) However, if the government is more than a “passive auditor,” as where it actively inveigles a fellow prisoner to inform against defendant or affirmatively plays on the informer’s self-interest, it risks being held accountable for the informer’s actions. In determining whether agency exists, the court must be mindful that “the niceties of rule-complying form could easily mask the substance of a true agency relationship.” (Supra, at 335.) In the present case, the court finds no evidence that an agency relationship arose on March 24, 1998, albeit the only testimony concerning that meeting came from Mr. Miller.[3] In any event, the court is not aware of any statements by Mr. Fox between March 24 and March 26, 1998, the date that the People concede that an agency relationship was established.
*1028 In arguing that his statements to Mr. Miller and Detective Kinsley were taken in violation of his right to counsel, defendant seeks to extend the right to counsel rules which apply when a defendant has retained counsel in a criminal proceeding. After the right to counsel has indelibly attached by the actual appearance of an attorney representing the defendant in a criminal case, the police are prohibited from interrogating the individual concerning a new case in the absence of his attorney in two distinct situations. (People v Cohen, 90 NY2d 632, 638 [1997].) The first of these is where the two criminal matters are so closely related transactionally, or in space or time, that questioning on the unrepresented matter would all but inevitably elicit incriminating statements regarding the matter in which there had been an entry of counsel. (Supra.) A second line of precedent involves interrogations concerning crimes less intimately connected, but where the police were aware that the defendant was actually represented by an attorney in one of the matters. (Supra, at 640.) In both situations, the right to counsel which is recognized on the new case is a “derivative right to counsel”, that is it is derived from the attorney’s appearance in the prior related, criminal case. (People v Bing, 76 NY2d 331, 344 [1990].) Where the new case is “unrelated”, defendant is free to waive his rights in the absence of counsel.
In the case at bar, Mr. Fox asserts a derivative right to counsel based on his representation by counsel in the civil contempt proceeding. A recent case from the Appellate Division, Third Department, indicates that there is no such derivative right to counsel based on an attorney’s appearance in a civil case. In People v Kent (240 AD2d 772 [3d Dept 1997]), a child abuse petition was filed against defendant in Family Court, alleging that he sexually abused his stepdaughters. Counsel was assigned in the Family Court article 10 proceeding. When defendant was subsequently interrogated by the police seeking to charge him with the crimes of sexual abuse and sodomy, defendant made an inculpatory statement in the absence of counsel. Claiming that he could not waive the right to counsel in his attorney’s absence, defendant moved to suppress the statement as taken in violation of his right to counsel. In affirming the denial of his suppression motion, the Appellate Division, Third Department, held that the criminal action and the Family Court proceeding were unrelated. “Although this action and the article 10 proceeding arise out of the same matrix, they are unrelated in that the article 10 proceeding *1029 was a civil proceeding focusing on the children, whereas the purpose of this action was to secure a criminal conviction”. (240 AD2d, at 773.)
Mr. Fox’s claim to a derivative right to counsel is far weaker than the claim asserted in Kent (supra). Inasmuch as Mr. Fox is not being prosecuted for embezzlement of estate assets, he cannot claim that the criminal solicitation prosecution arises out of the same matrix as the civil contempt proceeding. That Mr. Fox’s motivation for soliciting his brother’s murder was revenge for the contempt citation does not render the two proceedings “related” within the meaning of Bing (supra). The purpose of a civil contempt proceeding is to coerce compliance with the court’s mandate. (Matter of Department of Envtl. Protection v Department of Envtl. Conservation, 70 NY2d 233, 239 [1987].) Manifestly, the purpose of a criminal action is to secure a criminal conviction and accord punishment to the accused. As the Third Department accurately reasoned in Kent (supra), the disparate forms of relief sought in the two actions show that the present criminal prosecution is unrelated to the prior civil contempt proceeding. Thus, his representation by counsel in the civil contempt matter does not give rise to a derivative right to counsel in these subsequent criminal proceedings.
Even assuming, arguendo, that representation in civil contempt proceedings could give rise to a derivative right to counsel, the new crime in progress exception would defeat defendant’s asserted right to counsel herein. Neither the Federal nor the State constitutional guarantee of the right to counsel includes the right to have counsel present when a criminal enterprise is being planned or executed. (People v Bell, 73 NY2d 153, 161 [1989].) Defendant’s statements to Mr. Miller constitute the planning and preparation of his solicitation of Detective Kinsley to harm Mr. Fox’s brother. Defendant’s statements to Detective Kinsley constitute the actual performance of the criminal solicitation. All of these statements come within the new crime exception to any purported right to counsel.
Nor was there any Miranda violation. The questioning of an inmate in a correctional institution is not custodial interrogation unless it entails added constraint that would lead the inmate reasonably to believe that there has been a restriction of his freedom over and above that of ordinary confinement in a correctional facility. (People v Alls, 83 NY2d 94 [1993].) Since Mr. Fox’s conversations with Miller and Detective Kinsley took place under conditions of ordinary confinement in the Nassau *1030 County jail, Mr. Fox was not subjected to custodial interrogation. Accordingly, no Miranda warnings were necessary.
Ultimately, defendant’s challenge to the admissibility of the statements he made to Miller and Detective Kinsley boils down to the question of whether the investigation techniques were so fundamentally unfair as to violate due process of law. (See, People v Tarsia, 50 NY2d 1, 11 [1980].) As with any undercover operation, a measure of guile and deception was utilized. Quite obviously, Mr. Fox was not told that Mr. Miller was an informant or that “Billy” was really a detective. However, the stratagem involved no risk that Mr. Fox would falsely incriminate himself. Mr. Fox claims that his statements were somehow involuntary because he was “vulnerable” to Miller’s suggestion that he contact Billy. Granted, Mr. Fox had been in jail for over a year and was desperate to extricate himself from his predicament. However, as does any contemnor, Mr. Fox held the keys to his own freedom. Despite his incarceration, Mr. Fox had the power to purge his contempt and obtain his release by performing the acts he had been directed to perform, that is, making a proper accounting to the Surrogate’s Court. (See, Judiciary Law § 775.) That he made the deliberate choice to pursue criminal means in an attempt to escape the consequences of his contempt of court did not render him vulnerable and does not make the ensuing statements involuntary. Accordingly, that branch of the motion which is to suppress statements is in all respects denied.

. The lawyer, whose name is John Clifford, was assigned to represent Mr. Fox in the civil contempt proceeding on February 23, 1998.

. Subsequent to the arrest of Mr. Fox, Mr. Miller received a recommendation from the District Attorney of a six-month sentence to cover both the scheme to defraud and certain criminal contempt charges. The District Attorney also brought Mr. Miller’s cooperation to the attention of prosecutors in Maine where other charges were pending against Miller.

. Defendant, emphasizing Mr. Miller’s unsavory background, mounts a vociferous attack on his credibility. However, in view of the court’s determination of the legal issues raised on this motion, it is not necessary for the court to rely on his credibility.