[849 NYS2d 674]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v STACY
J. ADAMSON, Appellant.

Third Department, December 20, 2007

**APPEARANCES OF COUNSEL**

*Teresa C. Mulliken*, Harpersfield, for appellant, and appellant pro se.

*Robert M. Carney, District Attorney*, Schenectady (*Philip W. Mueller* of counsel), for respondent.

**OPINION OF THE COURT**

CARPINELLO, J.

The victim in this case was a shy, middle-aged man with limited mental capacity. His decision one Saturday night in February 2003 to meet with a prostitute he had talked to on a telephone chat line and his subsequent second thoughts about engaging in any sexual contact with her would prove fatal. The last 24 hours of his life were filled with horrific acts of torture, including repeated savage beatings and relentless acts of sexual assault in unsuccessful attempts to extract his semen. These acts were spearheaded by the prostitute's pimp—defendant, a three-time felon—in the furtherance of the prostitution ring he ran out of his apartment in the City of Schenectady, Schenectady County.

Participants in the 32-year-old defendant's prostitution enterprise included troubled teenaged girls, including the prostitute the victim encountered that night, 16-year-old Chev-

ena Polite, and defendant's 19-year-old wife, Taryn Blair Adamson. Defendant regularly used physical violence and intimidation to control his prostitutes. With respect to Polite in particular, defendant plied her with drugs, engaged in sexual intercourse with her despite her age and beat her every other day. On one such occasion, after Polite ran away and told her mother about defendant's abuse, he whipped her as she hung naked and handcuffed to a pipe in the attic as others watched.

In the weeks leading up to the victim's fateful encounter with this loathsome threesome, defendant's prostitution enterprise evolved from mere sex for money to robbery and extortion. While either Adamson or Polite "entertained" a customer, the other would steal his money. Defendant was typically hiding in the wings armed with what appeared to be a real gun should any trouble arise. Stealing money from wallets evolved to stealing money from one customer's car and coercing another to withdraw funds from his bank account. All money generated by the prostitutes, whether through sex acts or robbery, went directly to defendant.

On the night in question, defendant emerged from his hiding spot upon learning that the victim wanted to leave before engaging in any sexual act with Polite. Blocking the front door, defendant commanded the victim to "finish what he started" and demanded that he produce a semen sample.[1] While defendant was relatively calm at first, he became increasingly agitated and threatening. In his petrified state, and despite the performance of various sexual acts by both Polite and Adamson, the victim was unable to comply. Defendant therefore punched him in the face and then began hitting and kicking him as the victim cried and begged to leave. He was then bound and gagged. Beatings by defendant and attempts to produce semen continued over the course of the next several hours. Armed with his realistic looking gun, defendant also threatened to shoot the victim. At one point the following morning, the victim, bloodied, bruised and nearly naked, was dragged into the freezing attic until his lips turned blue. He was then brought back downstairs and put in a closet.

Throughout that day, and despite the victim's perilously enfeebled condition, defendant continued to beat him and even tried once again to extract semen by having Polite perform oral

---

1. This sample was to be used to extort large sums of money from him under threat of the statutory rape of Polite.

sex on him. At some point late in the day on Sunday, defendant forewarned the victim that he had one hour to produce semen or he would be killed. Shortly thereafter, defendant kicked the victim between his legs, rendering him unconscious, and shook him, causing him to vomit blood. Around midnight on Sunday, after being alone with defendant for a period of time, the victim finally died.

During the breaks in this savageness, defendant used the victim's vehicle to run errands, entertained company in the living room, made calls on the victim's cell phone, ate and slept. During this same time period Adamson made attempts to console the victim and to convince defendant to get medical attention for him, which were met with violence. Immediately following the victim's death, defendant wasted no time in orchestrating the disposal of his body. Wrapped in sundry household items, the victim's body was stashed in his own vehicle. The threesome then made their way downstate where defendant considered various ways to dispose of both the body and the vehicle. At some point on Monday, he made the decision to leave it in a dumpster in Queens County.[2]

The threesome then made their way back to Schenectady. During this time period, defendant made it clear to Adamson that Polite herself had to be killed. Adamson's intervention—she refused to let defendant be alone with Polite—prevented any harm from coming to Polite. When they arrived back at the apartment, defendant ordered Polite to scour the crime scene and ordered Adamson to solicit one last customer to secure getaway funds. Both complied, resulting in the accumulation of garbage bags full of bloodied evidence, a bleached-down apartment and additional cash, including money stolen from the customer's wallet.[3]

One week after this ordeal began, the victim's family reported him missing and the threesome was quickly located in Texas, as a result of the global positioning system in his vehicle. Although initially giving police a bogus story contrived by defendant, Polite and Adamson eventually confessed. Defendant, for his part, initially stood by his bogus story but later confessed, albeit placing most of the blame on Adamson and Polite.

2. The victim's body was never recovered.

3. In their haste to get away, the garbage bags were left in the apartment and thus the gruesome evidence contained therein was ultimately retrieved by police.

Following a jury trial at which Adamson and Polite testified against him establishing the previously-outlined series of events, defendant was found guilty of various counts and degrees of murder, kidnapping, coercion, assault, sexual abuse, robbery, grand larceny, tampering with physical evidence, rape, promoting prostitution and endangering the welfare of a child.[4] In addition to other sentences, defendant was sentenced as a persistent felon to concurrent lifetime sentences without parole for each count of murder. He now appeals. Of the myriad arguments raised on appeal, only a few are actually preserved for review.[5] Considering only those preserved issues, we find just one to have merit.

At the close of the People's proof, defendant moved to dismiss three particular counts of the indictment on legal sufficiency grounds, namely, murder in the first degree as charged in count 3 (referred to as witness elimination murder), robbery in the first degree as charged in count 14 and robbery in the second degree as charged in count 17. Viewing the evidence in a light most favorable to the People, we are satisfied that there exists a valid line of reasoning and permissible inferences which could lead the jury to its conclusion of guilt on each of the robbery counts (see *People v Bleakley*, 69 NY2d 490, 495 [1987]). We reach a contrary conclusion with respect to the witness elimination murder count.

■ Even viewing the evidence in a light most favorable to the People, we are unable to conclude that it was legally sufficient to constitute witness elimination murder under Penal Law § 125.27 (1) (v) (*compare People v Cahill*, 2 NY3d 14 [2003]). This statute provides that a person is guilty of murder in the first degree when "the intended victim was a witness to a *crime committed on a prior occasion* and the death was caused for the purpose of preventing the intended victim's testimony in any criminal action or proceeding whether or not such action or

---

**4.** Pursuant to plea agreements, Adamson and Polite each pleaded guilty to robbery in the first degree and hindering prosecution in the first degree. Adamson was sentenced to 15 years in prison and Polite was sentenced to 10 years.

**5.** In particular, arguments concerning voir dire, the prosecution's opening and closing statements, a psychological evaluation conducted of defendant during trial, County Court's alleged failure to swear in prospective jurors and to properly admonish the jury, the suppression of defendant's initial statement to police, the merger doctrine and the legal sufficiency of certain counts of the indictment are unpreserved for this Court's review and we decline to exercise our interest of justice jurisdiction with respect to such arguments. Even if we were to review these claims, we would find them unavailing.

proceeding had been commenced" (Penal Law § 125.27 [1] [v] [emphasis added]). Here, while there was evidence that defendant refused to get medical assistance for the victim out of concern that he would go to the police, we find that the victim was not a witness to a crime committed on a "prior occasion" as contemplated by this statute.[6]

The People argue that the victim, prior to dying, was indeed a witness to prostitution, his own physical and sexual assault and the various theft-related crimes committed against him such that the evidence was legally sufficient to support defendant's conviction under this count. Although a facially appealing argument, we are ultimately constrained to a different conclusion. The crimes committed against the victim were not "prior" crimes but rather ongoing crimes from which he was never able to extricate himself alive (*compare People v Cahill, supra*). This being the case, his murder cannot be considered witness elimination murder. In other words, while in the most technical sense, killing a crime victim to avoid detection is witness elimination, the inclusion of the phrase "committed on a prior occasion" in the statute convinces us that the victim of crimes during an uninterrupted period of captivity is not the type of "witness" intended to be protected under this statute.

While the Legislature never defined or explained the phrase "prior occasion," it did explain in an Assembly Codes Committee Memorandum that:

> "[Penal Law § 125.27 (1) (v)] elevates intentional killings to first degree murder when such killings *threaten the integrity of the justice system* and impede the ability of law enforcement authorities to prevent and punish serious crime. Killings must be committed 'for the purpose' of preventing, influencing or retaliating for prior testimony. Thus, this provision is applicable when there is both a defined victim characteristic (witness, immediate family member) and when it can be proven that the defendant's motivation for committing a killing was to prevent or influence the *actual testimony* of a victim in a criminal proceeding" (Mem of Assembly

---

**6.** Notably, in moving to dismiss this count at the close of the People's proof, defense counsel squarely raised this precise issue by arguing that there was insufficient proof that the victim was killed to prevent testimony for a crime committed "on a prior occasion" since the crimes committed against him were ongoing.

Codes Comm, Bill Jacket, L 1995, ch 1, at 21 [emphasis added]).

Here, since the victim was killed at the end of an uninterrupted crime spree that had yet to be reported, his murder could not have threatened the integrity of the justice system as specifically envisioned by the Legislature under this particular murder statute (*compare People v Cahill, supra*). Under these circumstances, we find that count 3 of the indictment should have been dismissed.

Defendant's remaining claims do not merit extended discussion. First, he argues that oral and written statements to police three days after his arrest in Texas should have been suppressed because they were coerced.[7] Testimony at the *Huntley* hearing reveals that defendant was given *Miranda* warnings prior to speaking with a Texas ranger on the afternoon in question. During the interview, which lasted less than two hours and took place in the presence of several officers, defendant was alert, awake and cooperative. He never requested an attorney or to terminate the interview. Moreover, no threats or promises were made and no physical force was ever inflicted upon him. Rather, evidence reveals that the interviewing ranger remained calm at all times. While defendant spontaneously expressed a desire "to live" at the end of his written statement, no specific discussion of any potential punishment, including the death penalty, was discussed during the interview.

Thus, there has been no showing whatsoever of any police deception during the interview, let alone "fundamentally unfair" deception (*People v Tarsia*, 50 NY2d 1, 11 [1980]), and no showing that promises and/or threats were made which, in turn, induced a false confession by defendant (*see id.*; *People v Davis*, 18 AD3d 1016, 1017 [2005], *lv denied* 5 NY3d 805 [2005]). To this end, in denying defendant's motion to dismiss these statements, County Court expressly credited the testifying officer (*see People v Mateo*, 2 NY3d 383, 414 [2004], *cert denied* 542 US 946 [2004]; *People v Brown*, 39 AD3d 886 [2007], *lv denied* 9 NY3d 873 [2007]). Notably, defendant himself did not testify at the hearing (*see People v Ortiz*, 16 AD3d 831 [2005], *lv denied* 4

---

7. In the course of the interview, defendant was advised that Adamson and Polite had both retracted their initial statements and confessed in writing to the crimes committed against the victim. While defendant initially continued to deny knowledge about "any kind of murder in Schenectady," he eventually admitted that there had been a murder but claimed that others, including Adamson and Polite, were responsible. His oral statements were then committed to writing and signed by him.

NY3d 889 [2005]) or otherwise present any proof of force, coercion or improper promises and threats.

Rather, on appeal he cites several, unpersuasive factors to suggest coercion, namely, that a trained interrogator was brought in to question him,[8] that several officers were present during the interview and that the interviewing ranger persisted in questioning him despite the fact that he was crying and that he initially denied knowledge about the murder. In short, the evidence adduced at the *Huntley* hearing provides ample support for County Court's finding that the statements given on this day were not coerced (*see People v Mateo*, 2 NY3d at 414-417; *People v Davis, supra*). As a final matter, we find no error in any aspect of County Court's *Molineux* ruling or its accompanying limiting instructions to the jury. Even if any error was committed, it was harmless given the overwhelming evidence of defendant's guilt (*see People v Crimmins*, 36 NY2d 230 [1975]).

Defendant's remaining contentions, including those contained in his pro se brief, have been reviewed and found to be without merit.

MERCURE, J.P., SPAIN, MUGGLIN and KANE, JJ., concur.

Ordered that the judgment is modified, on the law, by reversing defendant's conviction of murder in the first degree under count 3 of the indictment; said count dismissed and the sentence imposed thereon vacated; and, as so modified, affirmed.

---

**8.** Using a ranger trained in interrogation techniques, according to defendant, "raises the red flag" that such ranger will conduct a coercive investigation. Suffice it to say, we are unpersuaded.