■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ROBERT UROWSKY, Appellant. — Judgment, Supreme Court, New York County (G. Roberts, J., at plea and sentence; Altman, J., at suppression hearing), rendered June 10, 1982, unanimously reversed, on the law and the facts, the judgment of conviction and the plea of guilty vacated, defendant-appellant's motion to suppress granted to the extent hereinafter indicated, and the matter remanded for further proceedings. On December 3, 1979, at approximately 7 P.M., undercover Police Officer Marinos and another undercover were taken by a confidential informant to apartment 14G at 201 East 25th Street, Manhattan, and were there introduced to defendant as prospective customers. A woman was also present. After brief conversation, defendant and the informant left the apartment to speak in private. Upon their return, defendant took Marinos into the bedroom where he expressed his concern that Marinos was really a police officer; upon Marinos' denial, there was some further brief conversation and Marinos started to leave. Defendant called him back and inquired as to the amount of contraband Marinos sought to purchase; it was agreed that Marinos would purchase 10 ounces of cocaine at $1,750 per ounce. The other undercover and the informant were left behind in the apartment while Marinos and defendant went downstairs to view a sum of money in Marinos' car trunk, parked nearby. Defendant made a phone call from a nearby booth, and brought Marinos back to the apartment, advising that the package would arrive shortly. Marinos then asked his partner and the informant to leave, and was then escorted to the bedroom, where he was to wait. Defendant left, and shortly returned, to ask Marinos to come to the kitchen, where defendant produced a plastic bag from under his shirt. The goods were examined, and defendant told Marinos to go downstairs and get the money. However, Marinos demanded to see the rest: defendant had displayed only one ounce. Marinos was told to wait, while defendant left. On his return, he removed from under his shirt a large plastic bag containing nine smaller ones. Marinos was told that one bag was the equivalent of two ounces. Again defendant asked Marinos to go down and get the money, but Marinos invited him to come down and get the money with him. Defendant agreed, but he first wanted to return the package; leaving the apartment, he returned a few minutes later, and the two then left. While walking to the elevator, defendant indicated that his "man" was in an apartment down the hall. The two then descended in the elevator, exited the building and approached Marinos' car, in which the other undercover was sitting. When the car's trunk was opened — the prearranged signal to the backup officers — a number of armed officers, one with a shotgun, converged on defendant. His immediate reaction was to shoot his hands up into the air. However, he was told to keep them down and he was then taken into the lobby of a nearby building. There, defendant blurted: "Listen, if I bring you upstairs and show you where the other stuff is, would you let me go?" The lieutenant

holding his arm agreed.[*] This happened moments after the armed detention, but before issuance of any *Miranda* warnings. Defendant was not handcuffed, a step that was unnecessary in light of the fact that he was surrounded by several armed officers. Defendant was then escorted back up to the apartment and in the elevator he made additional admissions. Once one of the police officers — a lieutenant, no less — agreed that the defendant would be let go if he showed them where the other "stuff" was located; any subsequent statements became the product of that promise. "A confession, admission or other statement is 'involuntarily made' by defendant when it is obtained from him * * * [b]y a public servant engaged in a law enforcement activity * * * by means of any promise or statement of fact, which promise or statement creates a substantial risk that the defendant might falsely incriminate himself" (CPL 60.45, subd 2, par [b], cl [i]). As such, the statements rendered after the promise are inadmissible, as is the contraband eventually seized. Relying on police assurances, defendant led them to the exact place where the drugs were concealed. This was directly responsible for the seizure of the contraband, since Officer Marinos had only a vague idea of where defendant's "man" could be found. The exploitation of the statements, tainted by the promise of nonprosecution, requires suppression of the seized drugs as "fruits" of the illegally obtained statements. (*Wong Sun v United States*, 371 US 471.) Furthermore, an excessive amount of force was used to effectuate this arrest, 6 to 10 police officers, armed with weapons, being unnecessarily involved. Defendant's initial admission was anything but spontaneous; rather, it was compelled by the fact that he was surrounded by guns in a manner reminiscent of a late TV show. The arrest took place a few minutes before the admission occurred. *Miranda* warnings could have easily been delivered during the interim: defendant had quickly surrendered to the display of authority. There were no exigent circumstances to excuse failure of the police to immediately warn the defendant. Thus, the statements now must be suppressed. The result of the premature arrest is to cut off all evidence of consummation of the sale leaving, at most, proof of an attempt to sell. This burden would be less than that facing defendant when he pleaded guilty and he is entitled to be put in the position he would have been in had partial suppression been granted originally. He is entitled, therefore, to "have his plea back" and to have proceedings take their course from that point forward. Concur — Sandler, J. P., Sullivan, Markewich, Fein and Milonas, JJ.

---

[*] Obviously, he was without authority to do so, but, in the context, this was of no moment.