People v Cruz (2025 NY Slip Op 25025)

[*1]

People v Cruz

2025 NY Slip Op 25025

Decided on January 31, 2025

Supreme Court, Bronx County

Rosenblueth, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on January 31, 2025
Supreme Court, Bronx County

The People of the State of New York

against
Edison Cruz, Defendant.

Ind. No. 71927-22

For Defendant: Annette Lee, Esq.
Bronx Defenders
360 East 161st Street
Bronx, New York 10451
For People:
ADA John Miris
Bronx District Attorney's Office
198 East 161st Street
Bronx, New York 10451

Jeffrey Rosenblueth, J.

Defendant is charged in the above-referenced indictment with Murder in the Second Degree [Penal Law § 125.25(1)] and two counts of Attempted Murder in the Second Degree [Penal Law § 110/125.25(1)] and other related charges based upon his alleged intentional shooting on May 3, 2022, in the county of the Bronx, of three persons, resulting in the death of one of the shooting victims and non-fatal injuries to the two other shooting victims.
After motion practice, the Hon. Justice Tara Collins ordered Huntley, Wade, Mapp, and Dunaway hearings in a decision, dated August 5, 2022. In a subsequent decision, dated January 5, 2024, Justice Collins ordered a Rodriguez hearing as to the identification of defendant by Police Officer (hereinafter "P.O.") Adam Einhorn. These hearings were conducted before the Hon. Justice Jeffrey Rosenblueth, in Part 17, on April 18, 2024, April 22, 2024, July 30, 2024, July 31, 2024, August 1, 2024, September 5, 2024, and September 12, 2024. After these hearings were held, defense counsel filed a post-hearing memorandum of law on November 14, 2024. On December 6, 2024, the People filed a response to defendant's post-hearing memorandum of law.
On December 20, 2024, in Part 17, the Court issued its oral decision on the record granting and denying, in part, defendant's motions.
The People called Detective (hereinafter "Det.") Orlando Colon, Police Officer (hereinafter "P.O.") Adam Einhorn, Det. Yesenia Rosado, Det. Dominick Robinson, and Sargent (hereinafter "Sgt.") Agon Pukaj to testify at the hearing.[FN1]
The defense did not call
any witnesses at the pre-trial suppression hearing.
FINDINGS OF FACT:
Det. Orlando Colon's testimony
Det. Colon has been employed by the New York City Police Department (hereinafter "NYPD") for approximately eighteen years. He was assigned to the 46th Precinct Detective Squad since October 2012, including during the time that he testified at the hearing conducted in this case. In June 2014, he was promoted to detective. The Court finds Det. Colon's testimony to be credible in all pertinent aspects.
During Det. Colon's hearing testimony, various videotapes were placed into evidence including the defendant's videotaped statement at the 46th Precinct, a grocery store surveillance video and NYPD Argus surveillance video.
On May 3, 2022, at approximately 1:00 a.m., Det. Colon responded to a grocery store located at 6 East Burnside Avenue, in the Bronx, because of a report that three persons had been shot at that location. Upon arriving at the scene, Det. Colon observed that a shooting victim, later identified as David Scott, was dead and laying on the floor behind the store's counter. A second shooting victim, Meridiana Bektesovic, had been removed from the store and taken by ambulance to St. Barnabas Hospital before Det. Colon's arrival. A third shooting victim, Reginald Coleman, who had been shot in the arm, was also no longer present in the store when Det. Colon arrived.
While at the grocery store, Det. Colon downloaded and viewed the store's video surveillance. The grocery store's video surveillance depicted the decedent, David Scott, and a woman, later identified as Aailiyah Lawton, enter the store, and go to the back of the store. The video then showed an individual, dressed in black clothing and wearing a surgical mask, who was later identified as the defendant, open the store's front door, point a gun into the store, and shoot off several rounds. After watching the video, Det. Colon canvassed the vicinity of the shooting for more video surveillance, including several NYPD Argus cameras.
After canvassing the area for additional video surveillance, Det. Colon returned to the 46th Precinct Detective Squad. While at the 46th Precinct Detective Squad, Det. Colon and other members of his team accessed the NYPD Argus video surveillance through the NYPD's Domain Awareness System (hereinafter "DAS"). While Det. Colon and other members of his team were viewing the Argus video surveillance, Det. Agon Pukaj informed Det. Colon that he recognized the defendant, Edison Cruz, as the shooter depicted in that surveillance video. Det. Pukaj was familiar with defendant's appearance because he had previously arrested defendant for an unrelated matter. Further, Det. Pukaj had seen defendant at the Taco Bell at 2036 Jerome Avenue earlier that morning when detectives from the 46th Precinct Detective Squad first responded to a report of the shooting in the grocery store at 6 East Burnside Avenue, which was around the corner from the Taco Bell. When Det. Pukaj first saw defendant at the Taco Bell, following the shooting, Det. Pukaj had been canvassing the area of the shooting for video surveillance. He had gone to the Taco Bell, where defendant was employed, in an attempt to obtain video surveillance from the Taco Bell store to aid in the police investigation of the shooting. At that time, defendant was not yet a suspect in the shooting. Defendant did not become a suspect in the shooting until Det. Pukaj identified him from the Argus video as the shooter. Det. Colon further testified that he was informed by Det. Pukaj that when Det. Pukaj first went to the Taco Bell earlier in the morning of the shooting, defendant asked him if he was wearing a bulletproof vest.
The Argus video surveillance depicted, in pertinent part, the following: (1) the decedent, David Scott, and witness, Aaliyah Lawton, exit from the Taco Bell; (2) defendant exits from Taco Bell's employee/cargo entrance; (3) David Scott and Aaliyah Lawton re-enter the Taco Bell and leave a few minutes later; (4) defendant then walks north on Jerome Avenue to the corner of Jerome Avenue and East Burnside Avenue, and then continues east on East Burnside Avenue where he eventually arrives at the grocery store; (5) while in front, defendant shoots a firearm into the grocery store, and then enters the establishment and continues to shoot with the firearm; (6) defendant exits the grocery store, walks several city blocks to the vicinity of 1 East Tremont Avenue, where he then disposes a white bag into a trash can; (7) defendant then returns to the Taco Bell at 2036 Jerome Avenue.
After defendant had been identified by Det. Pukaj as the shooter in the Argus video surveillance, Det. Colon and members of his team responded to the Taco Bell, located at 2036 Jerome Avenue, with the intention of arresting defendant for the shooting incident. Upon arriving at the Taco Bell at approximately 3:50 a.m., defendant unlocked and opened the front door of the Taco Bell and allowed Det. Colon and other members of his team inside the restaurant. At that time, Det. Colon asked defendant if he could speak to the restaurant manager. Defendant then told Det. Colon that he was having a "rough day because he was attacked by a Black man with a stick." Defendant also told Det. Colon that he was in possession of a knife. Defendant's unsolicited statement was not in response to any question or statement made by Det. Colon or any other officer. Afterwards, defendant was handcuffed and placed under arrest for the [*2]shooting incident. In addition, at around the time of defendant's arrest, Det. Colon and his team went to the vicinity of 1 East Tremont Avenue, where they recovered a white bag containing a firearm from inside a trash can.
Defendant was brought to the 46th Precinct Detective Squad, where he was initially lodged in a holding cell. Afterwards, from approximately 4:43 a.m. to 7:48 a.m., Det. Colon and Det. Dominick Robinson conducted a videotaped interrogation of defendant in an interview room at the precinct. Initially, before defendant was informed of his Miranda rights, Det. Colon asked defendant several "pedigree" questions such as his name, date of birth and where he lived. During this period, before Miranda rights were given, Det. Colon asked defendant, "So you do street sweeping and you work at Taco Bell overnight?", to which defendant replied, "Yeah." Det. Colon followed up by asking defendant, "What time you start your tour? What time you start?", to which defendant replied, "9 p.m.". Det. Colon then asked defendant, "You start at 9 p.m. and you end ok?" and in response, defendant replied, "Yeah til four."
At approximately 4:49 a.m., Det. Colon informed defendant of his Miranda rights, to which, defendant indicated that he understood each right after it was given to him. Immediately, after Miranda warnings had been given, Det. Colon and Det. Robinson resumed their questioning of defendant about the shooting and the circumstances surrounding it.
During the course of defendant's post-Miranda interrogation, which lasted for approximately three hours, defendant often sat silent and refused to respond to questions posed by the detectives. As depicted in defendant's videotaped statement at the 46th Precinct interview room, at approximately 5:04 a.m., detectives asked defendant what happened outside the Taco Bell, to which defendant, for the first time, replied, "I don't want to talk about it." Defendant repeated this response several more times during the course of his interrogation. During cross-examination at the pre-trial suppression hearing, Det. Colon testified as to the following (Hearing Tr.,160:2-16):
Q. This interrogation started at approximately 4:43 a.m.?
A. Yes.
Q. And it ended at approximately 7:48 a.m.?
A. Yes.
Q. So in total it lasted for over three hours?
A. Correct.
Q. During that time period, Mr. Cruz said somewhere between seven and ten times "I don't want to talk about it"?
A. Correct.
Q. And each time Mr. Cruz said "I don't want to talk about it" you never stopped the interrogation?
A. Correct.
Q. You never said to Detective Robinson "this guy's invoked his right to silence. We need to stop"?
A. Correct.
After the interrogation, while at the 46th Precinct, Det. Colon took the clothing that defendant was wearing at the time of the shooting and vouchered it. The vouchered clothing included defendant's black pants, black shirt, and black hat.
Det. Colon testified that he also created a photo array containing six photographs, including defendant's photograph, that had been taken from a prior arrest. Det. Colon used a [*3]computer program to arrange the positions of the photographs in the array, including the defendant's photograph, which was placed in the number two position. Det. Colon testified that the computer also displayed photographs that were similar in appearance to defendant's prior arrest photograph. Det. Colon selected five photographs from this display, in addition to defendant's photograph, and the computer program determined the position in the array for each of these photographs. After the photo array was created, Det. Colon gave the array and the Photo Array Previewing Instruction to Witness Report to P.O. Yesenia Rosado, who administered a double-blind photo array procedure for witness Aaliyah Lawton. Det. Colon testified that P.O. Rosado, who was now a member of the 46 Precinct Detective Squad, did not have any prior knowledge of the instant case and its investigation. Moreover, Det. Colon was not present both when P.O. Rosado read the photo array previewing instructions to Ms. Lawton and showed the photo array to Ms. Lawton, who identified the defendant in the number two position of the array.
Approximately two hours after the photo array procedure was administered for Ms. Lawton, defendant made a statement to Det. Colon while he was being fingerprinted. This statement was unsolicited by Det. Colon or any other law enforcement officer. It was not in response to any questions first posed to defendant by Det. Colon or any other officer. Det. Colon also testified that he had not made any threats or promises to defendant to induce this statement while defendant was fingerprinted. At that time, the defendant stated to Det. Colon, in sum and substance, that,
"I was protecting myself because I did not want to die like Jesus. That is why I always carry a gun. I did what I had to do. Better him than me. The world is a better place without him because he's a revolving door of crime. The store owner gave him a stick and four people came to attack me. I have had the gun for six years."
Det. Yesenia Rosado's testimony
Det. Rosado has been employed with the NYPD for approximately six years as a police officer in the 46th precinct. Subsequently, in May 2023, she was promoted to Detective. The Court finds Det. Rosado's testimony to be credible in all pertinent aspects.
On May 3, 2022, at approximately 12:45 p.m., Det. Colon asked P.O. Rosado to administer a photo array for witness Aaliyah Lawton. When P.O. Rosado first arrived at the 46th Precinct on May 3, 2022, she did not know about the triple shooting that had occurred earlier in the day, nor did P.O. Rosado know that a suspect in the shooting was in police custody. P.O. Rosado was assigned to a separate team and tour of duty from that of Det. Colon. 
In order to administer the photo array, in addition to the photo array itself, Det. Colon gave P.O. Rosado instructions to be read to the witness prior to and after displaying the six picture photo array. P.O. Rosado testified that before showing the photo array to the witness, she read the following instructions to the witness, which were admitted into evidence (Det. Rosado hearing testimony, pp. 202-204):
You are about to view a photo identification procedure. If you consent, NYPD guidelines require that this procedure be audio recorded. Do you consent to the audio recording of the procedure?
(The witness did not consent)
As part of the ongoing investigation into a crime that occurred at 6 East Burnside Avenue on May 3, 2022, you are about to view a photo array.
It consists of six photographs of individuals. Each photograph has a number underneath [*4]the photograph. Take whatever time you want to view the photograph array.
The perpetrator may or may not be among the pictures. Do not assume that I know who the perpetrator may be. Do not ask me or anyone else in the room for guidance during the procedure.
Individuals presented in the photo array may not appear exactly as they did on the date of the incident because features such as head and facial hair are subject to change.
Photographs may not always depict the true complexion of a person. It may be lighter or darker than shown in the photo.
Pay no attention to any markings that may appear on the photos, or any other difference in the type of style of the photographs.
If you recognize someone, I will ask you to describe how sure you are using your own words without the use of numbers or percentages.
This question is not intended to suggest anything. I ask this question of every witness. After you have had the opportunity to view the photo array, I will ask you the following three questions: One, do you recognize anyone; two, if so, what is the number of the person you recognize; three, from where do you recognize the person; four, only if you recognize someone, I'm going to ask you to say in your own words how sure you are without using numbers or percentages.
I may ask you the follow-up questions — I may ask you follow-up questions. The investigation will continue regardless of whether or not you make an identification.
Do not discuss with other witnesses what you see, say, or do during the procedure.
After the above instructions were given to the witness, Ms. Lawton signed the document and P.O. Rosado then dated the document and signed the date. P.O. Rosado then showed the six-pack photo array to Ms. Lawton. Ms. Lawton identified the defendant, whose photograph was in the number two position of the photo array. Ms. Lawton indicated that she recognized defendant from the Taco Bell, and that she was familiar with defendant's eyes and the shape of his face from the shooting.
Det. Dominick Robinson's testimony
Det. Robinson has been employed with the NYPD for approximately twenty-four years and was assigned to the Bronx Homicide Squad since the summer of 2017. Det. Robinson has been a detective for approximately thirteen years. The Court finds Det. Robinson's testimony to be credible in all pertinent aspects.
On May 3, 2022, Det. Robinson was assigned to assist Det. Colon with an investigation that involved the instant case. As part of that investigation, Det. Robinson participated in defendant's videotaped interrogation at the 46th Precinct Detective Squad. Det. Robinson confirmed that during defendant's interrogation, which lasted over three hours, defendant stated, between seven and ten times, that he "did not want to talk about it."
Sgt. Agon Pukaj's testimony
Sgt. Pukaj has been employed by the NYPD for approximately eight years, and in July 2020, he was assigned to the 46th Precinct Detective Squad. In May 2024, Det. Pukaj was promoted to Sergeant. The Court finds Sgt. Pukaj's testimony to be credible in all pertinent aspects.
On May 3, 2022, Det. Pukaj and other members of the 46th Precinct Detective Squad [*5]received a report of a shooting involving a homicide, and they responded to a bodega, located at 6 East Burnside Avenue, in the county of the Bronx. Det. Pukaj testified that when he arrived at the bodega, he observed a body laying behind the counter. Det. Pukaj and his partner, Det. Burros, then canvassed the vicinity for video surveillance, which included going to the Taco Bell where defendant was working at the time.
When Det. Pukaj entered the Taco Bell, he asked defendant, who was behind the counter, if he could see the store's video surveillance. Defendant replied "no". While Det. Pukaj was present at the Taco Bell, defendant removed his face mask, and at that time, Det. Pukaj recognized him as a person he previously arrested regarding an unrelated matter. At this time, defendant was not yet a suspect in the shooting. The store's manager then gave Det. Pukaj permission to view the live feed of the video surveillance so that Det. Pukaj could see where the camera was focused on and in what direction. As Det. Pukaj proceeded to walk around the store's counter, defendant stood in Det. Pukaj's way and asked Det. Pukaj if he had his bullet proof vest on. 
After Det. Pukaj's encounter with defendant at the Taco Bell, he returned to the 46th Precinct Detective Squad, where he viewed video surveillance footage from the grocery store and Argus cameras. Detective Pukaj testified that the video surveillance from the grocery store depicted defendant shooting into the grocery store's interior while he enters the store.[FN2]
Defendant is observed fatally shooting David Scott and also shooting and wounding two other persons, identified as Meridiana Bektesovic and Reginald Coleman. The grocery store's video surveillance captures defendant facing the camera wearing a surgical mask. Afterwards, defendant is observed on video surveillance exiting the store and walking east on East Burnside Avenue, towards Walton Avenue.
Det. Pukaj also viewed the Argus video surveillance which recorded the route defendant took after the shooting at the bodega, until his return to the Taco Bell. At a certain point, while defendant walked west on East Tremont Avenue, the video surveillance reveals that defendant is no longer carrying a white bag, which he has since discarded. After Det. Pukaj watched the grocery store and Argus surveillance videos, he informed Det. Colon that he recognized the shooter at the grocery store to be defendant. At that time, Det. Pukaj told Det. Colon to go to the Taco Bell where defendant was employed. Detective Colon then proceeded to the Taco Bell and placed defendant under arrest.
DEFENDANT'S CLAIMS
With respect to the Huntley portion of the hearing, defendant claims that his entire videotaped statement while he was in custody at the 46th precinct must be suppressed. Specifically, the defense argues that the police interrogation of defendant regarding his employment, hours of employment and other non-pedigree subject areas before defendant was [*6]advised of his Miranda rights must be suppressed. Moreover, because there was no definite, pronounced break between the improper interrogation of defendant before Miranda warnings were given and after he was informed of his Miranda rights, the post-Miranda statement must also be suppressed as a "single continuous chain of events" (Def Memo, p. 10). Defendant further argues that during the precinct interrogation, when defendant first stated, "I don't want to talk about it," that defendant was unequivocally invoking his right to remain silent, which the detectives were required to "scrupulously" honor but failed to do so.
Additionally, defendant argues that defendant's statements were involuntary and therefore, cannot be used on cross-examination for impeachment of defendant at trial. In support of this position, the defense confirms that defendant's interrogation lasted over three hours, during which time defendant often remained silent and refused to answer questions, or repeatedly stated, "I don't want to talk about it." Additionally, the defense contends that during the interrogation, defendant was forced to endure the detectives "cursing" and "insulting" him, and one detective made promises to call defendant's mother if he would answer the detective's questions.
As to defendant's other noticed statements made on May 3, 2022, to Det. Pukaj at 1:30 a.m. at Taco Bell, to Det. Colon at 3:50 a.m. at the time of defendant's arrest at Taco Bell, and to Det. Colon at 2:45 p.m. while defendant was fingerprinted at the 46th precinct, defendant "rests on the record".
With respect to the Dunaway/Mapp portion of the hearing, defendant contends that the property that the police recovered from defendant, such as his clothing, cellphone, and knife, must be suppressed because the People, who have the "initial burden of going forward to demonstrate proper police conduct in obtaining evidence," failed to meet their burden at the suppression hearing (Def Memo, p. 14).
With respect to the Wade portion of the hearing defendant "rests on the record" as to the identifications of defendant made by witness Aaliyah Lawton and Det. Pukaj (Def Memo, p.15).[FN3]

PEOPLE'S RESPONSE
With respect to the Huntley portion of the hearing, the People argue that the defendant's statement to Det. Pukaj at 1:30 a.m. at Taco Bell was voluntary. The People further claim that defendant's statement to Det. Colon at 3:50 a.m., at the time of defendant's arrest at Taco Bell, was spontaneous. The People also assert that the pre-Miranda videotaped statements at the 46th Precinct were in response to Det. Colon's questions seeking defendant's routine pedigree information and as such, were "clearly administrative and not a disguised attempt at investigatory questioning" (Peo Response, p. 3). The People further argue that defendant's post-Miranda statement to detectives Colon and Robinson at the 46th Precinct occurred after defendant voluntarily waived his Miranda rights and chose to give a statement. In addition, the People assert that during the interrogation, despite defendant refusing to answer certain questions by stating, "I don't want to talk about it," when asked "certain direct questions about his involvement in the shooting," defendant "continued to answer other questions posed by the [d]etectives," thereby abrogating defendant's unequivocal right to remain silent (Peo Response, p. 3). The People "rest on the record" as to defendant's other noticed statements made on May 3, [*7]2022, to Det. Pukaj at 1:30 a.m. at Taco Bell, to Det. Colon at 3:50 a.m. at the time of defendant's arrest at Taco Bell, and to Det. Colon at 2:45 p.m. while defendant was fingerprinted at the 46th precinct.
With respect to the Dunaway aspect of the hearing, like the defense, the People "rest on the record" as to probable cause.
Regarding the Mapp portion of the hearing, the People's response indicates that they "have no intention at this time of proffering the knife or the cellphone, or its contents, at the trial as both items are arguably irrelevant to the issues at trial" (Peo Response, p. 7). The People, in their response do not address the clothing that was seized from the defendant after his arrest.
With respect to the Wade portion of the hearing, like the defense, the People "rest on the hearing record" as to the identifications by witness Aaliyah Lawton and Det. Pukaj. 
CONCLUSIONS OF LAW
DUNAWAY
CPL 140.10(1)(b) provides, in pertinent part, that "a police officer may arrest a person for a crime when he has reasonable cause to believe that such person has committed such crime, whether in his presence or otherwise." Probable cause or, reasonable cause, does not require proof "sufficient to warrant a conviction beyond a reasonable doubt but merely information sufficient to support a reasonable belief that an offense has been or is being committed The legal conclusion is to be made after considering all of the facts and circumstances together," People v. Bigelow, 66 NY2d 417 quoting People v. McRay, 51 NY2d 594 (see also People v. Maldonado, 86 NY2d 631).
At a suppression hearing, the People have the burden of presenting evidence of reasonable cause to show the legality of the police conduct (see People v. Baldwin, 25 NY2d 66; People v. Malinsky, 15 NY2d 86). The People must, therefore, demonstrate that the police acted with probable cause when they arrested the defendant (People v. see Bouton, 28 NY2d 130; People v. Berrios, 28 NY2d 361). Once this burden has been met, the defendant is responsible for proving the conduct was illegal (see People v. Berrios, supra; People v. Baldwin, supra). Evidence obtained by an illegal arrest is inadmissible at trial (see Mapp v. Ohio, 367 US 643).
Here, the Court finds that under the fourth level of People v Debour, 40 NY2d 210, Det. Colon had probable cause to arrest defendant based upon his viewing of the video surveillance from the grocery store and Argus cameras, which depicted the suspect's actions before, during, and after the shooting. Moreover, Det. Pukaj, who was familiar with defendant's appearance, communicated to Det. Colon that he recognized defendant to be the shooter in these videos from his arrest of Mr. Cruz from a previous unrelated matter.
In addition, when defendant was arrested, on the same day as the shooting, he was wearing the identical black clothes as that of the shooter depicted in the video surveillance (see People v Johnson, 195 AD3d 526, 526 [Probable cause for defendant's arrest was established by defendant's appearance in a surveillance videotape, which matched a photo of defendant from a prior arrest, as well as a Facebook photo of him wearing similar clothing]; People v Muhammad, 204 AD3d 1402 [Detective had probable cause to arrest defendant after viewing a surveillance video which depicted defendant, who shot the victim, wearing distinctive clothing, and later that same day the detective viewed another surveillance video at a nearby grocery store and identified defendant wearing the same distinctive clothing]).
Based on the foregoing, after "connecting the dots" of the sequential events that occurred [*8]from Det. Colon's investigation, it is clear that Det. Colon possessed "that quantum of knowledge sufficient to induce [even] an ordinary prudent and cautious person under the circumstances to believe" (People v. Martinez, 80 NY2d 444, 448) that defendant had committed the crime of Murder in the Second Degree and other related crimes (see People v Bigelow, 66 NY2d 417; People v McRay, 51 NY2d 594).
Further, as to the legality of defendant's arrest, it is well-settled that the "fellow-officer rule" permits an officer to arrest a suspect when the officer is acting at the direction of, or based upon information communicated from, another officer who actually has probable cause, (see People v. Ketcham, 93 NY2d 416) People v. Massey, 49 AD3d 462 (1st Dept 2008); People v. Green, 2 AD3d 279. Information received from a fellow officer is presumptively reliable, Ketcham at 419. Thus, Det. Colon had probable cause to arrest defendant based upon his own observation of the crime scene and his viewing of the video surveillance, coupled with the identification information that defendant was the shooter, which was provided by his fellow officer, Det. Pukaj. Similarly, Det. Pukaj had probable cause to arrest defendant after he watched the video surveillance of the shooting and recognized the defendant as the shooter depicted in the surveillance video.
MAPP
When physical evidence is sought to be suppressed, the general rule, subject to exceptions, is that the People must go forward with evidence tending to demonstrate a lawful rationale for the police conduct (see People v. Defrain, 204 AD2d 1002) but that the defendant has the ultimate burden of proving a lack of legal basis for the police action by a preponderance of the evidence (see People v. Milhouse, 246 AD2d 119).
Here, with respect to the firearm that the police recovered from inside a white bag found inside a trash can at 1 East Tremont Avenue, it is clear that defendant abandoned it by relinquishing any expectation of privacy in the firearm when he discarded it into a trash can located on a public street. (see People v Howard, 50 NY2d 583); People v Febu, 167 AD3d 451). Further, the abandonment of the firearm after the shooting incident was an independent, calculated act by defendant and not the result of improper conduct by law enforcement (see People v Ramirez-Portoreal, 88 NY2d 99, 110; People v Habeeb, 177 AD3d 1271). Thus, defendant's motion to suppress the firearm is denied.
Regarding defendant's clothing, which included his black pants, black shirt, and black hat, inasmuch as there was probable cause to arrest defendant, it was recovered as evidence pursuant to a search incident to a lawful arrest (see People Reid, 24 NY3d 615; People v Evans, 43 NY2d 160; People v Vennor, 176 AD2d 1217). Thus, defendant's motion to suppress this property is denied.
As to the cell phone and knife recovered from defendant, inasmuch as the People, in their written response to defendant's post-hearing memorandum of law, indicate that they "have no intention at this time of proffering the knife or the cell phone, or its contents, at the trial..." (People's Response, p. 7), defendant's motion to suppress such property is denied as moot.
HUNTLEY
At a Huntley hearing, the People have the burden of establishing beyond a reasonable doubt that statements made by a defendant to law enforcement authorities were made voluntarily (People v. Huntley, 15 NY2d 72).
In Miranda v. Arizona, 384 US 436, 444, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." In the absence of proof that a defendant was given the so-called Miranda warnings and knowingly and intelligently waived them, "no evidence obtained as a result of interrogation can be used against him" (id., at 479).
Fundamental to American jurisprudence is the precept that custodial interrogation conducted by law enforcement agents must be preceded by the warnings enunciated in Miranda v. Arizona, 384 US 436. Specifically, such agents must inform a person in custody of his right to remain silent and to have an attorney present during any questioning. A suspect may, of course, waive his Miranda rights by voluntarily, knowingly, and intelligently relinquishing those rights after having been made aware of them (see People v. Anderson, 42 NY2d 35; People v. Leonti, 18 NY2d 384; People v. Medina, 123 AD2d 331).
Miranda warnings are required only if there was a custodial interrogation of defendant. "In deciding whether a defendant was in custody prior to receiving his warnings, the subjective beliefs of the defendant are not to be the determinative factor. The test is not what the defendant thought, but rather what a reasonable man, innocent of any crime, would have thought had he been in the defendant's position (see People v. Yukl, 25 NY2d 585; People v. Rodney P., 21 NY2d 1; People v. DeJesus, 32 AD3d 753; People v. Robbins, 236 AD2d 823; People v. Lynch, 178 AD2d 779).
In making such an assessment, courts must consider the totality of the circumstances (see People v. Centano, 76 NY2d 837; see also Minnesota v. Murphy, 465 US 420). These circumstances include whether defendant voluntarily appeared at or accompanied officers, to the police precinct and whether questioning was conducted in a non-coercive atmosphere (see People v. Acquaah, 167 AD2d 313; People v. Davis, 161 AD2d 395).
A suspect is subject to interrogation when he is confronted with "express questioning or its "functional equivalent" (see Rhode v. Innis, 446 US 291). The "functional equivalent" of express questioning" is "words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect" (Rhode Island v. Innis, supra). The Court of Appeals has similarly held that "[w]hat constitutes 'interrogation' of a suspect is determined not by the subjective intent of the police, but by whether an objective observer with the same knowledge concerning the suspect as the police had would conclude that the remark or conduct of police was reasonably likely to elicit a response", People v. Ferro, 63 NY2d 316.
Statements made at a preliminary stage of an investigation in response to law enforcement agent's general inquiry are not usually considered the product of an interrogation (see People v. Johnson, 59 NY2d 1014; People v. Chestnut, 51 NY2d 14; People v. Huffman, 41 NY2d 29). Also exempted from interrogation are spontaneous statements that were essentially forced upon law enforcement agents and not the product of any inducement, provocation, encouragement, or acquiescence on their part (see People v. Maerling, 46 NY2d 289).
Here, with respect to defendant's statement to Det. Pukaj that he "can't get the video," after he was asked for Taco Bell's video surveillance, defendant was not in custody, nor was he a suspect in the earlier shooting incident. Therefore, Miranda rights were not required at this preliminary stage of the investigation (see People v. Harster, 63 Misc 3d 1209(A) ["statements made by a suspect at the preliminary stage of an investigation in response to a law enforcement [*9]agency's general inquiry are not usually considered the product of custodial interrogation," citing People v. Johnson, 59 NY2d 1014; People v. Chestnut, 51 NY2d 14]). Further, Det. Pukaj's request for video surveillance did not constitute an "interrogation" inasmuch as his request was not "express questioning" reasonably likely to elicit an incriminating response from defendant (see Rhode Island v Innis, supra). Thus, defendant's motion to suppress this statement is denied.
Regarding defendant's statement that he was having a "rough day because he was attacked by a Black man with a stick," which was made while inside Taco Bell to Det. Colon at around the time of his arrest, in response to Det. Colon's request to speak to the store's manager, here too, Det. Colon's request to speak to the store manager was not in the nature of an interrogation intended to elicit an incriminating response from defendant. As such, it was not subject to the Miranda rule (see Rhode Island v Innis, supra; People v Fero, 63 NY2d 316). Furthermore, defendant's statement to Det. Colon was spontaneous and unresponsive to Det. Colon's request to see the store manager. Defendant's statement was "self-generated" and made without apparent external cause. The spontaneity of defendant's statement was genuine and not the result of inducement, provocation, encouragement, or acquiescence (see People v Bryant, 59 NY2d 786; People v. Tavares- Nunez, 877 AD3d 1171; People v Harris, 57 NY2d 335; People v Cunningham, 49 NY2d 203). Thus, defendant's motion to suppress this statement is denied.
With respect to defendant's post arrest statements at the 46th precinct, made in response to Det. Colon's questions about defendant's place and hours of employment, it is well settled that routine "pedigree questions, such as those involved in booking, may be asked of defendant without providing Miranda warnings, (see People v Rodney, 85 NY2d 289, citing Pennsylvania v Muniz, 496 US 582; People v Kreydatus, 305 AD2d 935), so long as they are limited in scope to those necessary to administratively processing a defendant (see People v Acevedo, 258 AD2d 140; People v Greenleaf, 222 AD2d 838). Certainly, questions with respect to defendant's name, exact address and date of birth are reasonably related to administrative concerns and therefore fall within the scope of the pedigree exception to the Miranda rule (see Pennsylvania v Muniz, supra, at 601-602).
However, significantly, the People may not rely on the pedigree exception if the questions, though facially appropriate, are likely to elicit incriminating admissions because of the circumstances of the particular case (see US v Parra, 2 F3d 1058; US v Doe, 878 US F2d 1546; US v Simms, 719 F2d 375; People v Wortham, 37 NY3d 407; People v Slade, 133 AD3d 1203; People v Antonio, 86 AD2d 614).
Here, based on the circumstances surrounding the allegations in the instant case, it cannot be said that Det. Colon's questions regarding defendant's employment at Taco Bell and his work hours at that job, were merely related to routine administrative concerns. Rather, it is apparent that Det. Colon, knowing that the shooting victims had entered the Taco Bell where defendant was working prior to the shooting incident, asked these specific questions which were likely to elicit an inculpatory response from defendant. Therefore, the Court concludes that Det. Colon's questions were a disguised attempt at an investigatory interrogation, which first required that defendant be given his Miranda warnings. [see People v Mascall, 149 AD3d 525, 525 (1st Dept 2017), lv denied 29 NY3d 113 ("Defendant's statement regarding her place of employment, which was incriminating under the circumstances of the case, should have been suppressed. While employment related questions may fall under the pedigree exception to the requirement of Miranda warnings, we do not find that exception applicable to the facts presented (citation omitted)."); People v Dorvil, 175 AD3d 708, 709 (2nd Dept 2019) (Pre-Miranda interrogation [*10]regarding, inter alia, defendant's employment, the length of his tenure at his current job, and his job responsibilities were "reasonably likely to elicit an incriminating response from the suspect.")]. Consequently, defendant's pre-Miranda employment and related responses must be suppressed.
Defendant's Post-Arrest Mirandized Video Statements
In People v Chapple, 38 NY2d 112, the New York Court of Appeals held that, "[w]arnings, to be effective under the [holding] in Miranda, must precede the subjection of a defendant to questioning. Later is too late, unless there is such a definite, pronounced break in the interrogation that the defendant may be said to have returned, in effect, to the status of one who is not under the influence of questioning." 
Subsequently, in People v Bethea, 67 NY2d 364, 366 (1986), the Court of Appeals reaffirmed the viability of the rule declared in Chapple. In doing so, it held, "We conclude that the mandate of NY Constitution, article 1, § 6 that '[n]o person *** shall *** be compelled in any criminal case to be a witness against himself' would have little deterrent effect if the police know that they can as part of a continuous chain of events question a suspect in custody without warning, provided only they thereafter question him or her again after warnings have been given. The rule of the Chapple case, therefore, continues as a matter of State constitutional law, to govern the admissibility of statements obtained as a result of continuous custodial interrogation" (emphasis added).
Here, Det. Colon's pre-Miranda questioning, which was not limited in scope solely to pedigree questions, and Det. Colon's post-Miranda questioning constituted a "single continuous chain of events". Indeed, Det. Colon, pre-Miranda, questioned defendant regarding his employment at approximately 4:43 a.m. which was then immediately followed by the administering of Miranda warnings at 4:49 a.m. As such, based on the time differential, it is clear there was no "definite pronounced break in one interrogation that the defendant may be said to have returned, in effect, to the status of one who is not under the influence of questioning" People v Chapple, supra.
Additionally, in People v Paulman, 5 NY3d 122 (2005), the Court of Appeals enumerated other factors to consider when assessing whether there was a sufficient definite, pronounced break in the interrogation to dissipate the taint from a Miranda violation, including whether the same police personnel were present and involved in eliciting each statement; whether there was a change in the location or nature of the interrogation; the circumstances surrounding the Miranda violation, such as the extent of the improper questioning and whether, prior to the Miranda violation, defendant had indicated a willingness to speak to police. No one factor is determinative and each case must be viewed on its unique facts.
In the instant case, considering the additional factors set forth in Paulman, the continuous interrogation was conducted in the same interview room by the same detectives. Additionally, there is no indication that before the interrogation, that defendant had expressed a desire to speak to police (see People v Walker, 129 AD3d 1590 [suppression warranted of inculpatory statement produced in second interrogation, in the same location less than 10 minutes after the first inculpatory statement]; see also People v Ervin, 57 AD3d 1398; People Van Patten, 48 AD3d 30). Based on the foregoing, Det. Colon's pre-Miranda interrogation regarding defendant's employment effectively tainted the post-Miranda interrogation and thus, defendant's entire videotaped statement must be suppressed.
In any event, notwithstanding the suppression of defendant's entire videotaped statement [*11]for the aforementioned reasons, the portion of defendant's post-Miranda statements after he first told the detectives, "I don't want to talk about it," constitutes a ground for suppression.
In People v Brown, 266 AD2d 838, 838, the defendant, when asked about a crime, replied that "he did not want to talk about it," thus, unequivocally invoking his right to remain silent. The court opined that, "[t]he court erred in denying the motion to suppress. A suspect's right to remain silent, once unequivocally and unqualifiedly invoked, must be scrupulously honored (Miranda v Arizona, supra; Michigan v Mosley, 423 US 96, 103-104; People v Ferro, 63 NY2d 316, 322). In that event, "interrogation must cease" (see People v Gary, 31 NY2d 68, 70), and the suspect "may not within a short period thereafter and without a fresh set of warnings be importuned to speak about the same suspected crime" (see People v Ferro, supra, at 322); (see also People v Johnston, 192 AD3d 1516 [" 'It is well settled . . . that, in order to terminate questioning, the assertion by a defendant of his right to remain silent must be unequivocal and unqualified' Whether that request was 'unequivocal is a mixed question of law and fact that must be determined with reference to the circumstances surrounding the request[,] including the defendant's demeanor, manner of expression and the particular words found to have been used by defendant' (citation omitted)"]; People v Henry, 133 AD3d 1085,1087 [When a detective asked defendant about a shooting incident, "defendant's response — "I don't" — left nothing to the imagination Inasmuch as 'a defendant's invocation of the right to remain silent must be scrupulously honored once the right is asserted in an unequivocal and unqualified fashion,' and defendant made what can only be viewed as such an assertion, the interrogation should have stopped at that point (citations omitted)"]; People v Marrero, 199 AD3d 1471 ["If a person who is subject to police interrogation indicates in any manner, at any time prior to or during questioning, that he [or she] wishes to remain silent, the interrogation must cease about 20 minutes into the interrogation, defendant expressly stated that he did not 'want to talk about more of this [i.e., the shooting]. That's it.' We conclude that defendant thereby unequivocally invoked his right to remain silent (citation omitted) inasmuch as "[n]o reasonable police officer could have interpreted that statement as anything other than a desire not to talk to the police (citation omitted)."]; People v Johnson, 106 AD3d 1272, 1277 [The trial court should have suppressed the defendant's statements made after the point in time that defendant first unequivocally stated that he no longer wished to answer any further questions]).
Here, too, defendant Cruz's assertion "I don't want to talk about it" (which he repeated several times during the course of the interrogation) clearly was an unequivocal invocation of his right to remain silent such that "no reasonable police officer could have interpreted that statement as anything other than a desire not to talk to the police", People v Marrero, supra. As such, the detectives should have ceased their interrogation immediately after he stated that he did not want to talk about the shooting incident. Because the detectives failed to do so, defendant's statement after his request must be suppressed.
However, regarding defendant's subsequent statement to Det. Colon while he was being fingerprinted at approximately 2:45 p.m., "I was protecting myself because I did not want to die like Jesus. That is why I always carry a gun. I did what I had to do. Better him than me. The world is a better place without him because he's a revolving door of crime. The store owner gave him a stick and four people came to attack me. I have had the gun for six years", it was unsolicited and spontaneous. Specifically, Det. Colon testified at the hearing that defendant's statement was not in response to any question posed by him. (Hearing Tr., p.17). Thus, it was not made during an interrogation. Furthermore, there was no evidence that the statement was [*12]coerced in any manner or the result of inducement, provocation, encouragement, or acquiescence (see People v Tavares-Nunez, supra). Therefore, defendant's motion to suppress his statement to Det. Colon while being fingerprinted is denied.
As to defendant's motion to preclude the People from introducing or using defendant's suppressed statements on cross-examination for the purpose of impeaching defendant at trial, in People v Harris, 25 NY2d 175, the Court of Appeals made it clear that a statement taken from a defendant in violation of his Miranda rights may still be used on cross-examination of the defendant who has taken the witness stand in his own defense provided that a defendant's statement was voluntarily made. Traditionally, the issue of voluntariness centers around whether through the use of coercive techniques, law enforcement agents extract a statement with "complete disregard of whether or not [the accused] in fact spoke the truth" Rogers v. Richmond, 365 US 534, 544. Generally, the test for determining voluntariness is the "totality of the circumstances" standard (see United States v. Bye, 919 F2d 6; Terry v. LeFevre; 862 F2d 409; People v. Anderson, supra). Among the circumstances to be weighed are interrogation techniques such as physical abuse (see People v. Anderson, supra), psychological pressure (see Davis v. North Carolina, 384 US 737; see also Arizona v. Fulminate, 499 US 279; Blackburn v. Alabama, 361 US 199), food or sleep deprivation (see Ashcroft v. Tennessee, 322 US 143; Greenwald v. Wisconsin, 390 US 51) and the promises of immunity or payment (see People v. Dunbar, 53 NY2d 868; People v. Urowsky, 89 AD2d 520). It has been held that, under the aforementioned circumstances, a suspect's will is overborne (see also Brewer v. Williams, 430 US 387; Townsend v. Sain, 372 US 293; People v. Anderson, 42 NY2d 35; People v. De Jesus, 63 AD2d 148). Such statements, therefore, are deemed to have been obtained involuntarily and are inadmissible for any and all purposes including impeachment or rebuttal (see People v. Walker, 67 NY2d 776; People v. Maerling, supra).
Even absent a risk of false incrimination, suppression may nevertheless be warranted where the promise is so deceptive or egregious as to violate due process (see CPL 60.45(2)(b)(i)(ii); People v. Tarsia, 50 NY2d 1; People v. Everett, 10 NY2d 500; People v. Rossi, 26 AD3d 782; People v. Peters, 157 AD2d 806; People v. Taber, 115 AD2d 126). The burden of establishing the voluntariness of a suspect's statement beyond a reasonable doubt at a Huntley hearing is on the People (People v. Holland, 48 NY2d 861; People v. Anderson, 42 NY2d 35; People v. Huntley, 15 NY2d 72).
Here, the People satisfied their burden in proving that defendant's pre and post Miranda statements were nothing other than voluntary. No evidence was adduced at the hearing that defendant was deprived of food, water, sleep, or bathroom use. Nor was defendant subjected to any significant verbal abuse such that it could be said that his free will was overwhelmed creating a risk of false incrimination. In this regard, the Court notes that defendant's demeanor, as depicted throughout the video interrogation was, in this Court's view, "cool, calm and collected". 
As to Det. Colon's promise to call defendant's mother after the interrogation, significantly, it was a direct result of defendant's own request for Det. Colon to do so. Thus, contrary to defendant's claim, it was not deceptive as to violate defendant's due process. Based on the foregoing, defendant's motion to preclude the use of defendant's suppressed statements on cross-examination of defendant for impeachment purposes is denied.
Finally, with respect to defendant motion to suppress the photo array identification of defendant by witness Aaliyah Lawton, in general, once the People satisfy the burden of [*13]establishing the reasonableness of the arresting officer's actions and the lack of any suggestiveness in the defendant's identification, the defendant bears the ultimate burden of proof to establish that a pre-trial identification procedure was unduly suggestive (see People v. Ortiz, 90 NY2d 533; People v. Chipp, 75 NY2d 327).
Here, the evidence at the hearing clearly demonstrated that a properly conducted "double blind" photo array was conducted. In short, there was no testimony that Det. Rosado ever suggested that the witness select defendant in the photo array or that defendant would appear in the photographic array procedure. Indeed, Det. Rosado was not involved in the police investigation leading to defendant's arrest, did not prepare the photo array, and had no knowledge as to where the suspect was placed in the photo array. As such, it can hardly be said that "the procedure was so unnecessarily suggestive as to create a substantial likelihood of misidentification" People v. Duuvon, 77 NY2d 541. Therefore, the People have met their burden of showing the reasonableness of the photographic array procedure. Defendant, however, failed to meet his burden of establishing the presence of any undue suggestiveness. Thus, defendant's motion to suppress the photo array identification is denied,
This constitutes the decision and order of the Court. The Clerk is directed to forward a copy of the order and memorandum decision to the attorneys for the defendant and the District Attorney.
Dated: January 31, 2025
JEFFREY ROSENBLUETH, A.S.C.J.

Footnotes

Footnote 1:On May 3, 2022, at approximately 11:10 a.m., after defendant was already in police custody, P.O. Einhorn identified defendant from an Argus still photograph. The People have consented to withdraw their CPL § 710.30(1)(b) "confirmatory" identification notice as to P.O. Einhorn because it is not relevant to any issue at the pre-trial hearing and in any event, would not be admissible at trial. Therefore, it is not necessary to summarize P.O. Einhorn's hearing testimony.

Footnote 2:The Court notes that Det. Pukaj was permitted to identify defendant in the video surveillance because defendant's appearance as depicted in the video has dramatically changed. On the video, defendant has close cropped hair, almost shaven, and now, at the hearing, defendant has an extremely large bushy hairstyle. As such, Det. Pukaj's testimony was helpful to the Court, the fact finder, at this hearing with respect to the issue of probable cause (see People v Mosley, 41 NY3d 640).

Footnote 3:After the conclusion of the hearing, the People withdrew their CPL 710.30(1)(b) identification notice for P.O. Einhorn.